THE STATE OF KANSAS v. J. H. YARBOROUGH.

1. MURDER — *Malice Defined too Strongly in Instruction* — *Merciful Error.*
   Upon a trial for murder in the first degree, the court in its instruc-
   tions to the jury made malice aforethought an essential ingredient
   in murder of the second degree; and instead of defining malice afore-
   thought as "such a depraved condition of mind as shows a total dis-
   regard of social duty, and a heart bent wholly on evil," or as a "wicked
   purpose, or intention," incorporated in its definition some words
   making malice a condition of mind showing the existence of a pre-
   meditated and deliberately formed design on the part of the slayer
   to do the killing.   The court further charged the jury, however, that
   "murder in the second degree is the unlawful killing of another,
   purposely and of malice aforethought, but without deliberation and
   premeditation."   The jury found the defendant guilty of murder in
   the first degree.   *Held,* That the giving of a too-strong definition of
   malice in the instruction of murder in the second degree was an
   error on the side of mercy, and not prejudicial to the defendant.

The State v. Yarborough.

2. COOLING-TIME—*No Instruction as to Degrees of Manslaughter*—*No Prejudicial Error.* Where severe blows or other personal violence has been intentionally inflicted upon the defendant, and soon after he takes the life of the aggressor, the question whether a reasonable time has elapsed for his passions to cool and his reason to resume its control, is one of fact for the jury. The length of time necessary for cooling has never been made absolute by rule; it must, in the nature of things, depend much on what is special to the particular case. The time in which an ordinary man, under like circumstances, would cool, is generally a reasonable time. *Held,* In this case, however, so much time—about two hours—intervened between the quarrel of the deceased with the defendant and the killing; and so much thought, contrivance and design were betrayed by the defendant in the mode of possessing himself of the revolver with which he killed the deceased, and so much deliberation and express malice on the part of the defendant was established, that in view of the finding of the jury that the defendant was guilty of murder in the first degree, the trial court committed no error prejudicial to the defendant in failing to instruct the jury as to the several degrees of manslaughter.

*Appeal from Lyon District Court.*

PROSECUTION for murder in the first degree. From a conviction and sentence as charged, at the May term, 1887, the defendant, *J. H. Yarborough*, appeals. The opinion states the material facts.

*Scott & Frith,* for appellant.

*J. W. Feighan,* county attorney, and *L. B. Kellogg,* for The State.

The opinion of the court was delivered by

HORTON, C. J.: On the 25th day of January, 1887, an information was filed in the district court of Lyon county against J. H. Yarborough for murder in the first degree, charging him with having feloniously, willfully, premeditatedly, deliberately, and of malice aforethought, killed and murdered L. D. Collier, with a revolver, on the 22d day of November, 1886, in said county. The cause came on for trial at the May, 1887, term of court, resulting in a verdict of murder in the first degree. In due time, a motion for a new trial was

filed, and overruled; exceptions taken, and judgment rendered accordingly.

The evidence disclosed the following facts: L. D. Collier, just prior to his death, was an agent of the Atchison, Topeka & Santa Fé Railroad Company, and had charge of the material yards at Emporia; Yarborough was his clerk; they both boarded at the Palace Hotel in Emporia; at the time that Yarborough commenced boarding at the Palace Hotel, about six weeks before he killed Collier, the latter made arrangements with the hotel proprietor to be security for his board; up to the day of the killing, the relations of the parties were very friendly; the men were about the same weight; Yarborough was the taller of the two, but Collier was of heavier weight; they were both young men about the same age; Collier went from Emporia to Kansas City on Saturday, and returned the next Monday in the afternoon; in his absence, Yarborough attended to the office; before Collier returned on Monday, Yarborough had been drinking somewhat; in the afternoon of Monday, Collier and Yarborough had some angry words at the car clerk's office in the depot about five o'clock, whether or not a car of material had been sent out in time, Yarborough claiming it had; Yarborough asked Morse for the bill of the car, which was found, and then said to Collier, "There is the bill now; so you have had your trouble or worry for nothing;" Collier said to Yarborough that "he ought to have attended to business a little better during his absence;" Yarborough answered, "Haven't I always attended to business? haven't I always done your work?" Collier replied, "I don't want to talk with you; you are drunk;" Yarborough said, "If I have been drinking, I can talk;" Collier said, "Well, I don't want you to talk to me; you are drunk now; go home, and I will talk to you to-morrow." Yarborough answered with a vulgar remark, and Collier struck Yarborough three times, the last time knocking him senseless; after being knocked down, Yarborough had a bruise over his left eye and was bleeding at the nose; he was then very much excited and very angry, and said he "wanted Col-

lier to come back and give him an opportunity to whip him."
After Yarborough had got up from where he was knocked
down and had washed his face, he went into the train dis-
patcher's office and walked to the hook where Collier's mes-
sages hung; while standing by the hook looking at the messages,
Collier attempted to pass by him going out; Yarborough
jumped at Collier and struck him, leaving a mark or scratch
across his forehead; they clinched, but parties interfered and
separated them; F. A. Burgess took Yarborough by the arm
and went with him out of the building peaceably. Soon after-
ward Collier started down stairs, and at the foot of the stairs
he met Yarborough; both seemed somewhat excited, and Yar-
borough acted as if he wanted to make Collier fight again;
this lasted only a few minutes, as Collier went away; Yar-
borough then went to the Palace Hotel; this was about six
o'clock; at this time he seemed to be angry; upon the stair-
way of the depot, before leaving, he said, "If I live, he dies."
This was after the fights, and before the meeting at the foot
of the stairs; he also had a conversation with Prescott, of the
Palace Hotel, before supper, the drift of which was about
Collier and getting even, or having his revenge; although
under the influence of liquor and very much excited, he took
his supper, and after he had finished, came out of the dining-
room and was for a little time in the office of the hotel; he
left the hotel about half-past six o'clock; just before seven
o'clock Yarborough was in Lloyd & Thomas's store; he seemed
to be under a peculiar strain, quiet, and yet suppressing his
excitement; he said to L. M. Helig, "I have had a scrape
with Collier, and I got the worst of it;" he further said, "I
am going to get even with him if I have to get a gun and
kill him;" about a quarter past seven Yarborough went to the
confectionery and lunch-room of W. E. Rhoades, and asked him
"if he had a revolver;" Rhoades answered "Yes;" and Yar-
borough asked him "if he would loan the revolver;" then
Rhoades asked him "if he had had any difficulty with anyone
of late;" Yarborough said "he had not;" after a conversation
of about five minutes, Rhoades handed to Yarborough his re-

volver; Yarborough told him he simply wanted to "carry it till morning;" but did not indicate any other reason for wanting it; at this time Yarborough acted very quietly, and there was nothing in his manner to attract specially the attention of Rhoades; at the time Rhoades handed the revolver to Yarborough it was loaded; soon after leaving the place of business of Rhoades, Yarborough went to the house of Mr. Bundrem, on Market street, where Collier roomed; at the time, there were in the house Mr. and Mrs. Bundrem, Mr. Jones, Mrs. Weaver, Mr. Collier and others. Yarborough rapped at the door; Collier arose at the knock, saying, "he would answer the door;" Mrs. Bundrem insisted on going to the door, but Collier said, "no, he would go;" Collier had just time to get to the door and open it, when a pistol-shot was heard; Mrs. Bundrem rushed to the door, and Collier said to her, "I am shot;" Collier then went through the sitting-room and pantry into the kitchen, and fell dead. As he started from the door he said, "He is coming;" Yarborough came into the hall through the open door; Mrs. Bundrem caught him by the arm; he then had the revolver in his hand; she said to him, "Don't shoot;" Yarborough said, "No, I won't shoot you; I came here to shoot Collier; I thought he walked off so strong that I had missed my aim; I came here to shoot him, and I am going to shoot him." Yarborough went into the dining-room and was standing there with his revolver in his hand looking at Collier, who was lying on the floor, dead. Yarborough also told Mrs. Bundrem in the house after he shot Collier, that "He came there to kill Collier, and he hoped to God he had accomplished what he came for." At this time he pushed his hat back on his head and said, "This is what I killed him for"—showing a little lump on his forehead. The bullet from Yarborough's pistol struck Collier in the middle of the breast; Yarborough gave the revolver to Mrs. Bundrem after the killing of Collier, and she put it away. After the killing, Yarborough wanted Mr. Bundrem to protect him; he was afraid of being mobbed. When the crowd began to gather he became excited and was afraid of being lynched; he said,

"If he was in Texas, he would be lynched inside of an hour." He was soon arrested, and went away from the house in charge of the sheriff of Lyon county. On being asked his name he wrote it in full, and told the witness to write "guilty" under it. About ten o'clock, after reaching the jail, he asked the sheriff to telephone for a special train to take him to Topeka to protect him from lynching. From the time he came to jail until about three o'clock in the morning, his manner was wild, acting like a drunken man, a crazy man; one witness thought he acted wild, whether drunk or crazy, couldn't say; he would cry and curse so that one witness thought he was like a crazy and not a drunken man; he yelled out, "Give me my gun, give me my gun, you said you would protect me;" he expressed fears of a mob, and no one was near the jail except the officers, though there had been a crowd upon the stairway when he was taken to jail, but the crowd made no outcries or threats. The next morning about seven he awoke; did not know where he was, and when told he was in jail for the murder of Collier, said his mind was like a dream; asked about some dispatches, and said he didn't know he had killed Collier.

Several errors are alleged, for which a reversal of the judgment of the trial court is asked. The more important are: First, it is claimed that the trial court erred in its attempted definition in its instructions to the jury of the two degrees of murder, to which the court limited the consideration of the jury; and second, that the court erred in confining the jury to the consideration of murder in the first and the second degrees, and in refusing to instruct the jury as to the several degrees of manslaughter.

In its instructions to the jury, the court made malice aforethought an essential ingredient in each degree of murder; and instead of defining malice aforethought as "such a depraved condition of mind as shows a total disregard of social duty and a heart bent wholly on evil," or as a "wicked purpose or intention," incorporated in its definition some words making malice a condition of mind showing the existence of a premeditated and deliberately-formed design on the part of the

slayer to do the killing.   Conceding that the
definition of malice as given to the jury by the
court will bear the construction contended for, we
cannot perceive that Yarborough was prejudiced
thereby.   The error, if any error was committed, was in the
definition given by the court to the jury of malice, as applied
to murder in the second degree; that is, the court added an
essential element to murder in the second degree by a too-strong
definition of malice.   In defining murder in the second de-
gree, however, the court said to the jury: "Murder in the
second degree is the unlawful killing of another, purposely and
of malice aforethought, *but without deliberation and premedita-
tion.*"

*1. Malice, defined too strongly in instruction; defendant not prejudiced thereby.*

Again, the court said to the jury:

"If upon a full, fair and candid consideration of all the
evidence in the case, you should believe that the defendant at
the time and place mentioned in the information was of sane
mind, to the extent hereinbefore stated in instructions num-
ber ten and eleven, and that he then and there willfully,
deliberately, premeditatedly and with malice aforethought, as
hereinbefore defined, shot and killed L. D. Collier, you will
find the defendant guilty of murder in the first degree.

"If you do not so find, you will consider further, and if
you believe from the evidence that at the time aforesaid the
defendant was of sane mind as aforesaid, and shot and killed
L. D. Collier purposely and with malice aforethought, but
without premeditation and deliberation, you will find him
guilty of murder in the second degree."

The court also said to the jury:

"Deliberately, as used in connection with the crime of
murder, means with cool, considered purpose.   Premeditatedly
means with fixed and preconceived intention formed before
the act; the lapse of time, however, between the formation
and execution of such intention need not be long; it is suf-
ficient if such intention be fully formed before the fatal act."

So it seems to us that the jury must have fully understood
that there was an actual difference between murder in the first
and the second degrees, notwithstanding the definition of
malice given by the court; and that they understood that to

convict of murder in the second degree, premeditation and deliberation are not necessary to be established. Premeditation and deliberation as to murder in the second degree were so forcibly and repeatedly stated that the definition given to malice could not have misled. Instructions are to be considered and construed together as a whole, and if not erroneous when so construed, no one of them will be held erroneous. But again, the jury found the defendant guilty of the full offense charged, and ordinarily in such case, any error in the instructions concerning a less offense will be immaterial. (*The State v. Dickson*, 6 Kas. 209; *The State v. Potter*, 15 id. 302; *The State v. Rhea*, 25 id. 576.)

In *People v. Callaghan*, (Utah,) 6 Pac. Rep. 49, it is said:

"The court charged that premeditated intent to kill was a necessary ingredient of murder in the second degree. In this, the charge was more favorable to the appellant than the law warrants; and if the court erred in defining premeditation, it erred on the side of mercy, and the appellant cannot complain."

The instructions confining the jury to a conviction for murder in the first or second degree, read:

"In the crime of murder there are also involved several degrees of manslaughter; but as none of them are applicable to the facts proven, I do not deem it necessary or proper to define them, or instruct you in relation thereto. If you do not find the defendant guilty of murder in either the first or second degree, you will acquit him, whether sane or insane."

"Where a defendant is charged with an offense consisting of two or more degrees, he can be convicted of that degree thereof only concerning which there exists no reasonable doubt."

The objection is made to these instructions that the facts in the case showed gross provocation, without cause, to a peculiarly unfortunate man, calculated to arouse and which did produce intense passion and terrible excitement; therefore, it was for the jury, not the court, to say whether Yarborough's act was murder or manslaughter. We have already decided that instructions in a case of this kind, as well as in other

cases, should run to the facts as detailed by the evidence, and to all probable interpretations of them; but not to questions which, though possible under the information, are not in fact presented by the evidence. (*The State v. Hendricks,* 32 Kas. 559.) We suppose it must be admitted that the personal violence perpetrated by the deceased on the defendant was sufficient to enrage his passion and to provoke him to extreme anger; but as the killing did not immediately follow the provocation, the question is, did sufficient time intervene between the provocation and the fatal act for passion to subside and reason to interpose? Some of the authorities say that this is a question of law only. (*The State v. Sizemore,* 7 Jones, [N. C.] 206; *The State v. Moore,* 69 N. C. 267.) The great weight of authority, however, is that the question as to whether a reasonable time had elapsed for the passions to cool and reason to resume its control, is one of fact for the jury. It is said by Bishop:

"The length of time necessary for cooling has never been made absolute by rule; it must, in the nature of things, depend much on what is special to the particular case. The time in which an ordinary man, under like circumstances, would cool, is generally a reasonable time. If two men fall out in the morning, and meet and fight in the afternoon, and one of them is slain, this is murder; for there was time to allay the heat, and their after-meeting was of malice. And an hour seems to have been deemed sufficient. Three hours have been." (2 Crim. Law, § 712.)

2. Cooling-time; murder, when.

Most courts seem to agree that if it is clear that there was sufficient time between provocation and the killing to enable the court to determine that the passions had cooled, and so instructed the jury, no error would be committed. Of course, the case should be very clear. It must be borne in mind that the criminal law holds sane men responsible for the ordinary exercise of their reason; and that, although indulging to a certain extent mere infirmities of human nature, nevertheless it requires the exercise of control or mastery over one's passion. Hence it is said that "the time in which an ordinary

man, under or in like circumstances, would have cooled, is a reasonable time." (*Kilpatrick v. Commonwealth,* 31 Pa. St. 198.)

The law carefully distinguishes between a sudden transport of passion, which springs instantaneously from what it allows as a sufficient provocation, and which prompts to an immediate act of violence, and a purpose of revenge, which usually follows such passion. In the first case, in condescension to the frailty of our nature the law allows the provocation to extenuate a homicide committed at the instant, from murder to manslaughter. In the other, the provocation furnishing an incentive to revenge, so far from extenuating the crime, is a circumstance to be looked to as evidence of malice; and especially would this be so if the prisoner, in consequence of the provocation, had made threats against the life of the deceased. (*Felix v. The State,* 18 Ala. 720. See also 2 Bishop on Crim. Law, § 718.)

Looking at all the facts in this case, the time intervening between the altercations and the fatal shooting — about two hours — the taking of time by the defendant to eat his supper; remaining for a little while after supper in the office of the hotel; the going to Rhoades's store and asking for a gun and getting the revolver; his quiet and cool manner in this store; his telling Rhoades that he wanted the revolver "to carry till morning;" his going with his loaded weapon to the house of Mr. Bundrem, where Collier roomed; the threats he made before getting the revolver that "if I live, he dies," and "I am going to get even with him, if I have to get a gun and kill him;" his fatal shooting; his statements after the shooting that "I came here to shoot him, and I am going to shoot him;" his further statement after Collier was killed, that "he came there to kill Collier, and he hoped to God he had accomplished what he came for;" and his pointing out on his forehead a little bruise or lump, saying, "This is what I killed him for," with many other similar facts disclosed upon the trial, not only show that there was time between separation of the combatants and the fatal shooting, in which an ordinary

man, under like circumstances, would have cooled, but the acts. and conduct of Yarborough showed that he had cooled and was acting for revenge, on account of the blows received. In other words, Yarborough had ample time to exercise control or mastery over his passions, but nursed his wrath and committed the fatal act with express malice. Unless Yarborough was insane at the time of the homicide, the facts established a. brutal, cowardly and atrocious murder upon his part. The jury found against the defendant upon the question of insanity, which was interposed as a defense. Again, the jury were permitted to find, under the instructions, the defendant guilty of murder in the second degree. They found him, however, guilty of murder in the first degree; therefore the failure of the court to give instructions concerning the several degrees. of manslaughter, cannot be regarded so prejudicial to the defendant as if the jury had returned a verdict of murder in the second degree.

In *Johnson v. The State*, 30 Tex. 748, it was shown that a. fight occurred between the prisoner and the deceased between nine and ten o'clock, in which the prisoner had a pocket-knife, and the deceased a pistol; the difficulty occurred about a stolen horse which the deceased was accused by the prisoner of steal-ing; the prisoner struck the first blow; both parties gave up. their weapons to bystanders and fought with their fists; the prisoner was thrown by the deceased, and badly beaten about the head and face; the prisoner started home, and as he went, said: "I will go home, get my gun, and shoot him." The deceased was killed by the prisoner three hours later, being shot from a clump of brush as he was passing the road. The court held in that case that there was sufficient proof of express malice to constitute murder in the first degree. The court omitted to define the difference between murder in the first and second degrees, but the supreme court said it was. unnecessary to give that charge when there is proof of express malice.

In *Rex v. Oneby*, 2 Strange, 766, William Gower with others. were at an inn in a friendly manner playing dice; during the

playing, some angry words passed, when Oneby took up a bottle and with great force threw it at Gower; the bottle passed close to his head, but did not hit him; Gower immediately tossed a candlestick or bottle at Oneby, but did not hit him; both parties then attempted to draw their swords, but were prevented; Gower then threw away the sword, and the parties sat down for the space of an hour; at the expiration of an hour Gower said to Oneby, "We have had hot words, but you was the aggressor, but I think we may pass it over;" at the same time offering his hand to Oneby; Oneby answered, "No, damn you, I will have your blood;" soon after, all of the company excepting Oneby went out of the room; he remaining alone in the room called to Gower, "Young man, come back, I have something to say to you;" Gower returned into the room, and Oneby with his sword gave him a mortal wound, of which he died the next day. It was the unanimous opinion of all the judges that Oneby was guilty of murder. It was said in that case:

"If A says he will revenge himself of B, or will have his blood, this is express malice against B; and if the killing ensues, it is murder. If any deliberate act occurs, the question is determined. Thus the quarreling in the morning and deferring the fight to afternoon is a deliberate act that will make it murder; so if diversions intervene, or the parties fall into other discourses, it will be murder. Whenever in a case it has appeared that a person killing another has the exercise of his reason, he is out of the protection of the law and has been held guilty of murder."

In the cases cited by counsel for appellant showing the necessity of submitting to the jury the question of fact whether sufficient time had elapsed between the provocation and the killing for a defendant's passion to subside and reason to interpose, the time for cooling was comparatively brief; and hence in those cases the time was not so great as to enable the court to arbitrarily determine that it was sufficient for the passions to have subsided. An examination of the more important of these cases is convincing upon this point.

In *Maher v. The People*, 10 Mich. 212, the prisoner offered

evidence tending to show an adulterous intercourse between his wife and Hunt in the woods on the morning of the assault and within less than half an hour previous; the prisoner's wife and Hunt were seen coming from the woods together; the prisoner followed them and went in hot pursuit after Hunt to a saloon, in his shirt-sleeves, and in a state of great perspiration and excitement; as soon as he came up to Hunt in the saloon he fired his pistol. In such a case the court had no right to decide that a reasonable time had elapsed for cooling.

In *Ferguson v. The State*, 49 Ind. 33, the court charged the jury: "To reduce a homicide upon provocation, it is essential that the fatal blow shall have been given immediately upon the provocation." This instruction was held erroneous. Immediately means: "on the moment; directly; quickly; at once; *instanter*." We fully agree with this decision.

In *Ex parte Moore*, 30 Ind. 197, the only question before the court was whether the offense with which the prisoner was charged was a bailable one. The prisoner and the deceased met at a saloon, where they engaged in playing cards and drinking beer, until they both became intoxicated; they finally got into a dispute upon the subject of politics, and scuffling ensued between them, when the prisoner, in attempting to jerk away from the deceased, partially fell and knocked down the screen, which lodged without falling entirely down, but leaving the prisoner under it; the deceased then caught him by the legs and attempted to draw him back into the room, but he kicked loose, and as he was crawling out to the doorway the deceased kicked at him, but whether he hit him or not the witnesses could not tell; the prisoner's face and neck were scratched and bleeding, and the marks on the neck resembled finger-prints; the prisoner then left, much excited; he lived but a short distance from the saloon; he walked hurriedly home, and very soon came out of his house with a revolver in his hand; he returned rapidly to the saloon, still holding the revolver in his hand, and as soon as he entered the saloon and saw the deceased, who was standing at the counter, he drew and fired the shot which resulted in the death of the deceased. The period inter-

vening from the time the prisoner first left the saloon until his return, when he shot the deceased, did not exceed five minutes. The court held, upon a motion to admit the prisoner to bail, that it was not clear that there was sufficient time between the provocation and the act for passion to cool and reason to resume control. Nothing else was decided.

In *The State v. Hockett,* (Iowa,) 30 N. W. Rep. 742, the prisoner learned that improper relations existed between his sister and the deceased; he followed them to Oskaloosa, but was not able to find them. They having returned in the direction of home, he followed; they separated, and he stated to more than one person that he intended to shoot the deceased; he met, or saw the deceased walking along a road, and shot him. In that case, it is true, the court instructed the jury that if the killing was done in the heat of blood, or passion, upon sudden quarrel, and upon reasonable provocation, and without malice, express or implied, the prisoner was guilty of manslaughter, unless he was not accountable for his acts on account of insanity; but the court further charged the jury that "the fact, if it be a fact, that the deceased had previously been criminally intimate with the prisoner's sister, or the prisoner had reason to believe he had been so intimate, would not constitute the provocation referred to in the instructions." Hence the court really took the question of provocation away from the jury. The jury found the prisoner guilty of murder in the first degree, and sentence was pronounced thereon. The supreme court affirmed the judgment.

In *McConnell v. The State,* (Tex.,) S. W. Rep. 698, the prisoner was found guilty of manslaughter. It appeared in that case, that in 1882 domestic trouble arose between the prisoner and his wife; he left home with his wife and an infant, in a buggy, to go to the house of his father-in-law for the purpose of consultation and settlement; upon the way, the infant was killed. The state contended that the prisoner shot the infant with his pistol. The defense was that the infant was killed by upsetting of the buggy. This was the prisoner's theory of the death. The court, therefore, in that case, com-

mitted error in not failing to charge upon the law of negligent homicide. The case was reversed for that cause.

In *Leggett v. The State,* 21 Tex. App. 382, two colored men, Neal and Frazier, got into a controversy together and became angry; Frazier struck at Neal with a spoke of an engine; the blow struck the prisoner on the side of the head and prostrated him to his knees; at the time he was struck he had a chisel or screw-driver in his hand and by some means was cut on the arm and bled freely from it; when he arose from his knees he struck Frazier on the head, and Frazier went out of the door saying he would get his pistol and kill the prisoner; within a brief time the prisoner came up to the deceased, one John Andrews, fired at him with his pistol, killing him instantly, saying: "That is the damn rascal that cut me." The deceased had had nothing to do with the trouble or difficulty between Neal and Frazier, or Frazier and the prisoner. In that case it was decided that the trial court should have charged the law of manslaughter. The reasons given therefor were: "There was evidence tending to prove a blow on the head, a wound that drew blood, and blood enough drawn to make the person of the party bloody; also, that there was excitement and passion, and that the killing followed in the track of the blow, the blood and the passion, within a brief period, and may have been attributed to the passion, but the person killed was not the person who aroused the passion, but another person, who had no connection with the trouble." In that case, the jury found the defendant guilty of murder in the second degree only. Further, in that case, not so much time had elapsed for the passions of the prisoner to cool as in the case at bar; nor did the prisoner in that case betray so much thought, contrivance and design in the mode of possessing himself of the pistol, as in this case.

In *Rex v. Lynch,* 5 Car. & P. 324, the prisoner killed the deceased with a knife, the knife he had upon his person at the time of his scuffle with the deceased, and there was only an interval of five minutes, or less, between the time deceased

struck the prisoner and the killing. A charge concerning manslaughter was in that case necessary and proper.

In *Rex v. Hayward*, 6 Car. & P. 157, the prisoner was charged and convicted of murder. The deceased was requested by his mother to turn the prisoner out of her house, which the deceased, after a short struggle with the prisoner, effected, and in doing so, gave him a kick; the prisoner instantly went to his own lodging, distant two or three hundred yards, and obtained a sharp butcher's knife, with which he usually ate; within five minutes after the prisoner left the deceased, the latter followed him up the street for the purpose of giving him his hat; he soon met the prisoner, and the prisoner gave him a mortal wound with his knife. In this case also, the law of manslaughter was defined to the jury, but the shortness of time which elapsed between the original quarrel and the stabbing by the prisoner was commented upon and referred to.

But it is unnecessary to refer to all the authorities cited in support of the proposition that where severe blows or other personal violence has been intentionally inflicted upon the defendant, and soon after he takes the life of the aggressor, the trial court must charge upon the law of manslaughter, as the question whether a reasonable time had elapsed for the passions to cool, and reason to resume its control, is one of fact for the jury. In this case, however, so much time intervened between the quarrel of the deceased with the defendant and the killing; and so much thought, contrivance and design were betrayed by the defendant in the mode of possessing himself of the revolver with which he killed the deceased; and so much deliberation and express malice on the part of the defendant were established, that in view of the finding of the jury that the defendant was guilty of murder in the first degree, the trial court committed no error prejudicial to the defendant in confining the jury to the consideration of murder in the first and the second degrees; and in failing to instruct the jury as to the several degrees of manslaughter.

2. Cooling-time; no instruction as to degrees of manslaughter; no error prejudicial to defendant.

There were several other instructions given by the trial

court which are commented upon and criticised in the briefs. We have examined fully these instructions, and also the objections taken to them, but do not perceive that they were erroneous. One or two of the instructions are subject to criticism, but not sufficiently so as to render them prejudicial.

The instructions concerning intoxication and insanity sufficiently embrace the law applicable to this case. Lord Bacon said that: "If a madman commit a felony he shall not lose his life for it, because his infirmity came by act of God; but if a drunken man commit a felony, he shall not be excused, because the imperfection came by his own default." For this reason the courts unanimously hold that if a man kills another while in a fit of voluntary intoxication, it is murder, and he must suffer the penalty. Of course drunkenness may be considered by the jury in determining whether there was that deliberation, premeditation and intent to kill necessary to constitute the offense charged. In this case it is not claimed that the drinking had created *delirium tremens*, or that the defendant was insensible. We think he was not so drunk as to have lost his understanding or reason. Counsel assert that when the defendant was only a little drunk, he became wild, vicious, and ungovernable. They refer to his unprovoked attack upon Jordon in 1882, and to his attempt in 1883 to cut the throat of a friend. It seems that when he indulged in drinking intoxicating liquor, even to a slight extent, he became a second Mr. Hyde. Upon this account, it is urged that he should be dealt with more leniently. Our decisions denominate drunkenness *malum in se*, and not an innocent mistake merely. ( *The State v. Brown,* 38 Kas. 390.)

If the story of Dr. Henry Jekyll were true, rather than a fanciful one, Dr. Jekyll, according to the theory of counsel, ought not to have been responsible for the murder of Sir Danvers Carew, although he voluntarily drank the potion that so powerfully controlled and shook the very fortress of his identity. Dr. Jekyll, like Yarborough, when not under the influence of the fatal potion which he accustomed himself to drink, was of a very kind disposition and unusual

amiability.   After drinking the drug or tincture, he doffed at once the body of the noted professor, and assumed like a thin cloak, that of Mr. Hyde; his pleasures then turned toward the monstrous, and his whole being, as Mr. Hyde, was inherently malign, brutish, and wicked.   At such times the kindness and virtues of Dr. Jekyll slumbered, but the evil of Mr. Hyde was alert and swift to seize the occasion.   Should it be said that Dr. Jekyll was not responsible, and that Mr. Hyde, after all, and Mr. Hyde alone, was the guilty one?  Yarborough is not to be relieved from responsibility because he did not get drunk with the thought of a difficulty with Collier. Dr. Jekyll did not drink the drug, changing his character to one wholly evil, for the purpose of injuring the child he cruelly trampled upon, nor to take the life of Sir Danvers; but in that case as in this, a wicked and depraved disposition was developed or produced by the voluntary act of the party. If the indulgence in a slight degree in intoxicating liquor awoke in the defendant the spirit of hell, he should have refrained from touching the intoxicating draught; he should have chosen the better part, and not been found wanting in strength to keep it.

"The law will hardly recognize the theory that any uncontrollable impulse may so take possession of a man's faculties and powers as to compel him to do what he knows to be wrong and a crime, and thereby relieve him from all criminal responsibility.   Whenever a man understands the nature and character of an act, and knows that it is wrong, it would seem that he ought to be held legally responsible for the commission of it, if in fact he does commit it." (*The State v. Nixon*, 32 Kas. 205; *The State v. Mowry*, 37 id. 369.)

In the tragedy of Othello, Montano, to quiet Cassio, who had taken a few cups, but was unfortunate in the infirmity, said: "Come, come, you're drunk."   Cassio, in return, at once thrust him through with his sword.   Soon after, in his grief and remorse over the act, he said: "Oh, thou invisible spirit of wine, if thou hast no name to be known by, let us call thee — devil."   What Cassio uttered, Yarborough may well repeat. He voluntarily stripped himself of all those balancing instincts

by which even the worst of us continues to walk with some degree of steadiness among temptations; and in his case to be tempted, however slightly, was to fall.

Upon the whole record, the judgment of the district court will be affirmed.

All the Justices concurring.