No. 98,573

STATE OF KANSAS, *Appellee*, v. TORIANA L. HENSON, *Appellant.*
(197 P. 3d 456)

Opinion filed December 12, 2008.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Sheryl L. Lidtke*, deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Stephen N. Six*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Toriana L. Henson was convicted of premeditated first-degree murder for the shooting death of Randy Davis and of criminal possession of a firearm. He appeals, raising a four-pronged attack on his murder conviction. This court has jurisdiction under K.S.A. 22-3601(b)(1) (life sentence; off-grid crime).

We reject Henson's attacks on the verdict and conclude the trial court correctly ruled: (1) evidence of specific acts of violence committed by the murdered victim was not relevant because there was no showing the fights had any connection to the murder, the fights did not involve or relate to the defendant, and there was no evidence the fights affected the actions of the defendant, who did not claim defense of self or another; (2) a lesser included offense instruction for voluntary manslaughter was not appropriate because the evidence established that the victim's provocation of Henson occurred 20 to 30 minutes before the shooting, and during this time Henson had cooled off and planned an act of retribution; and (3) lesser included instructions for second-degree murder or involuntary manslaughter were not appropriate because there was no evidence the shooting was reckless. Because we do not find error in any of these issues, we also reject Henson's argument that cumulative error denied him a fair trial and affirm his convictions.

## FACTS

Davis suffered a fatal gunshot wound to his head in the early morning hours of Saturday, May 20, 2006. The shooting occurred at an auto sales business in Kansas City, Kansas, operated by Louis Novello and located on Novello's property.

Novello detailed some of the events leading up to the shooting during his trial testimony. He testified that on Friday, May 19, 2006, Davis and Kevin Leopard repaired pavement at the car lot. Around 8 p.m., after the auto business had closed, Novello noticed that Davis and some of Davis' friends were still there. Novello left for several hours. When he returned, Davis and others were talking

and drinking beer on the front porch of Novello's home, which was located near Novello's car lot and garage. Novello told Davis he "didn't want the drinking going on" and then went inside his house.

At that point, according to the testimony of Leopard, Davis, Leopard, and Adolph Moreno, Jr., went to a bar. Leopard testified that after the three men left the bar they returned to the car lot where they gathered outside the garage located at the business and continued drinking along with some others. Henson arrived at some point when Davis had gone to purchase more beer.

When Davis returned, the men started talking about boxing and self-defense. Henson was joking around and, referring to Davis, said: "[T]he bigger they are, the harder they fall." With that, "just out of the blue," Davis punched Henson, who fell to the ground. Henson was knocked out for about 10 minutes. Davis stood ranting and tried to kick Henson in the head, but one of the others pulled Davis away. Then Davis retreated into the garage. When Henson gained consciousness, he managed to stumble away with the help of Shannon Hall. Hall told the others he was taking Henson to the hospital, and Henson indicated he was going to the hospital.

At approximately the same time as Henson regained consciousness, Novello came back onto the porch of his house and saw Hall helping Henson walk around. To Novello, it appeared that Henson had either been punched or was drunk. Henson fell onto the porch and mumbled something unintelligible, and Hall led Henson off the porch. Novello saw the two men drive off together in a minivan.

After Hall and Henson left, Leopard tried to get Davis to leave the scene because he had a bad feeling about the night's events, but according to Leopard: "[Davis] didn't listen to me or anybody else that whole night." Instead, Davis stayed at the garage and bragged about knocking out Henson. During this time, according to one witness, Davis said he felt threatened when Henson made the "harder they fall" remark and thought Henson might try to do something.

Meanwhile, Hall and Henson went to Henson's home instead of going to the hospital. When they arrived at the home around 1 a.m., Henson's wife, Cathleen, was asleep. She awoke when she heard Henson running water in the upstairs bathroom and got out

of bed to check on him. She saw blood trailing from his mouth to both ears, his lip was injured, he had blood on his shirt, and he had a dirty spot on the back of his bald head. Henson told his wife he had been hit and knocked out by someone she did not know. According to Cathleen, Henson indicated that he and the other individual had been drinking when the "guy just hit him." He stated that he "didn't see it coming."

After Henson had cleaned up, he and Cathleen went downstairs where he introduced his wife to Hall, who was waiting near the front door. Cathleen returned upstairs, but before the men left the house, Cathleen saw a gun in Henson's hand. She assumed it was the gun he kept on top of the grandfather clock in the dining room. Cathleen told the jury, "[N]othing he said really made me believe that, you know, he was going to do something horrible."

Henson and Hall returned to the car lot 20 to 30 minutes after they had left. Moreno, who was outside when Henson and Hall returned, testified that Henson walked up with a gun in his hand. Moreno tried to talk Henson out of shooting Davis, but Henson uttered no response and continued walking into the garage where Davis and several others were sitting around talking, drinking, and smoking methamphetamine. Henson walked into the garage wearing a dark hooded jacket, which he had not had on earlier. He wore the hood, but his face was still visible. Henson—standing to Davis' left—pointed the gun at Davis' head, saying, "What's up now, Randy?" Davis turned, started to rise up, and lifted his left hand as if he was trying to move the gun. Henson fired one shot into Davis' head, and Davis fell to the ground. Everyone else, including Henson, fled the garage. Then, Henson and Hall left the car lot once again.

Henson and Hall went to Wendy Foster's apartment, arriving at her apartment around 2 a.m. on May 20. According to Foster's testimony, Henson had been "dating" a friend of hers named Amanda Trott (apparently despite his marriage), and Trott was at Foster's apartment on the night of the murder. When the men arrived at the apartment, Henson was still angry about being punched, and his lip was bleeding. Henson said a guy hit him for no reason, so he shot him in the head. Foster testified that she saw

Henson pull two guns out from underneath his shirt and place them into Trott's suitcase.

Henson left Foster's apartment with Hall for a brief time, returned alone, and stayed at her apartment until around 5:30 a.m. During that time, Henson drank a few beers and talked about the murder and about running to Oklahoma. Then, Henson and his girlfriend Trott left with a suitcase and two guns.

According to Henson's wife Cathleen, Henson returned home around 5 a.m. After telling Cathleen he wanted to go to Oklahoma for a few days, Henson left. Later that evening, Henson returned. The next day, Henson voluntarily talked to detectives, after which he was arrested and charged with the murder of Davis.

## PRIOR ACTS OF VIOLENCE

The first issue raised by Henson is that the trial court wrongfully refused to allow cross-examination of State witnesses regarding prior acts of violence committed by Davis, the murdered victim. Henson contends that evidence concerning specific instances of conduct was admissible to establish Henson's state of mind and to dispute the State's proof of intent and premeditation, two requisite elements of premeditated first-degree murder. He points out that this court has stated: "Premeditation 'is a state of mind' relating to a person's reasons and motives for acting as he or she did." *State v. Saleem*, 267 Kan. 100, 105, 977 P.2d 921 (1999); see also *State v. Warledo*, 286 Kan. 927, 949, 190 P.3d 937 (2008) (premeditation is " 'the time of reflection or deliberation' "). By excluding this evidence, Henson argues, he was prevented from presenting his theory of defense (on which he fails to elaborate in his brief).

The trial court rejected Henson's argument that the evidence was relevant to his motive or intent. Appellate review of a trial court's exclusion of evidence as irrelevant is guided by the statutory definition of relevant evidence, which is defined in K.S.A. 60-401(b) as "evidence having any tendency in reason to prove any material fact." As we recently stated, this definition embodies two components: whether the evidence is probative and whether it is material. *State v. Vasquez*, 287 Kan. 40, 50, 194 P.3d 563 (2008); *State v. Reid*, 286 Kan. 494, 504-05, 186 P.3d 713 (2008). When

an appellate court considers a trial court's ruling on relevance, the question of whether evidence is probative is judged under an abuse of discretion standard; materiality is judged under a de novo standard. *Reid*, 286 Kan. at 507-09. "[I]f either the probative or materiality element's standard is not met, then the evidence is inadmissible." 286 Kan. at 509.

Generally, evidence of intent is relevant in a first-degree murder trial because intent is an element of the crime. Motive, although not an element, may be relevant because it explains the motivating force behind the crime. *Vasquez*, 287 Kan. at 52. This does not mean that evidence of specific violent acts of the murdered victim that are unrelated to the shooting are probative of intent or motive, and, in the opinion of the trial court, they were not in this case.

The first ruling to this effect occurred during defense counsel's cross-examination of Novello. In questioning Novello, defense counsel had asked a series of questions about Davis' reputation and violent character. For example, defense counsel asked if Novello knew Davis "to be somebody who like[d] to get into altercations or fights." Novello answered in the affirmative. Also, Novello testified that Davis had previously fought in "Tough Man contests" and continued to be involved in fights or altercations. When defense counsel asked whether Davis approached people to "just pick fights with them," Novello answered, "Probably. I mean I couldn't say for sure. I only seen a few fights . . . ." After that answer, defense counsel asked: "[Did] Randy talk to you about fights that he had been in, in altercations?" It was at that point that the prosecutor objected.

During a bench conference, defense counsel proffered evidence showing that in the hours preceding the murder, Davis had become violent with individuals at the bar. Defense counsel contended that Henson heard about these altercations from Davis and "other people," which caused Henson to be fearful and to "get something to protect himself." The trial court found there was no evidence to support this argument, noting Henson left and went home to get his gun after Davis punched him, not after he heard of the other fights.

The other line of questioning not allowed by the trial court arose during the State's cross-examination of Moreno. Defense counsel asked about bruises on Davis' chest, which Moreno acknowledged Davis had shown him. When Moreno was asked how Davis obtained the bruises, the court sustained the State's relevance objection after defense counsel proffered that the bruises resulted from a fight on the day before the murder.

The trial court did not foreclose all evidence of Davis' violent behavior, however. For example, the trial court did not limit evidence relating to events that took place during the late evening hours of May 19 or early morning hours of May 20 involving those who were at the scene of the shooting. As a result, defense counsel was allowed to ask Novello whether he had observed any fights between Davis, Henson, Hall, or Moreno on the night of the murder; Novello indicated he had not seen any fights. Nevertheless, through other witnesses, defense counsel was able to elicit testimony that earlier in the day of the murder Davis was "very irate" and was "poking [Hall] in the chest with his finger and pushing him a bit." A witness indicated that Hall, who Davis had pushed up against a truck, was "pretty scared."

In addition, although the trial court did not allow Moreno to testify about a fight that caused Davis' ribs to be bruised, defense counsel was able to ask Moreno questions about Davis' general character, leading to Moreno testifying that Davis "was a bully. [He] was always very aggressive and, you know, if you want to say that, you know, some people took him wrong if you didn't know him, he was loud and was pushy."

Thus, contrary to Henson's arguments, the trial court's decision to prohibit counsel from probing into the bar fight or a fight on the previous day did not deprive Henson of the ability to present his defense. Witnesses' testimonies conveyed the victim's general aggressive nature to the point that the district court commented, when making a ruling outside the presence of the jury, that everyone in the courtroom knew Davis was a bully. Further, defense counsel characterized Davis as "an individual who followed the Tough Man life" in her closing argument, stating in part:

"[A]ll Randy Davis did was try to pick fights with people. He was constantly involved in fights.

"On this particular night—and you can use your own common sense, by the way, as far as what type of individual that was, what type of individual is somebody who's always trying to pick a fight with somebody, always trying to intimidate people, always trying to scare people."

The trial court's rulings merely foreclosed questions relating to the bar altercation and a fight the previous day, and Henson does not explain how these fights were probative of any material fact, including intent or motive. As the trial court noted, the evidence was that Henson interacted with Davis, presumably after having been told of the fights by Davis or others, and even antagonized Davis with the "harder they fall" statement. Additionally, Henson did not claim either self-defense or defense of another. Nor did he tie the previous altercations to any other potential issue; there was no evidence nor a proffer establishing that anyone involved in the fight the previous day or at the bar was present at the time of the shooting.

In other words, the trial court did not abuse its discretion when it ruled two specific fights involving the murdered victim were not probative of any material issue in the case; there was no showing the fights had any connection to the murder, the fights did not involve or relate to the defendant, and there was no evidence the fights affected the actions of the defendant, who did not claim defense of self or another. Moreover, Henson was not prevented from presenting his defense.

## VOLUNTARY MANSLAUGHTER

Next, Henson raises the issue that the trial court erred by failing to instruct the jury on the lesser included crime of voluntary manslaughter. Henson's contention lacks merit.

The standard of review for determining this issue varies depending upon whether the instruction was requested. Compare *State v. Cook*, 287 Kan. 1098, Syl. ¶ 4, 191 P.3d 294 (2008) (if instruction is not requested, claim of error reviewed under clearly erroneous standard; K.S.A. 22-3414[3]) with *State v. Moore*, 287 Kan. 121, 130, 194 P.3d 18 (2008) (if instruction is requested, claim

of error reviewed by examining evidence to determine if lesser included offense is established by evidence when viewed in light most favorable to requesting party). In this case, the determination of which standard applies is not clear. The record on appeal does not reflect a specific request for an instruction on voluntary manslaughter. Nevertheless, during the instructions conference, the trial court acknowledged that defense counsel had "informally requested instructions on basically voluntary manslaughter and involuntary manslaughter."

Then, after a recess during which the trial court reviewed testimony regarding a witness' observation of the shooting, the court ruled that the evidence did not support "an instruction . . . on reckless involuntary manslaughter." In response, defense counsel argued in favor of giving such an instruction. The trial court was not persuaded and further ruled that an instruction on voluntary manslaughter was not warranted either. Specifically, the court determined the evidence did not support a voluntary manslaughter instruction, finding that in this case "there was a period of time for a cooling off period that an ordinary person would have regained reasoning."

Although any "request" for a voluntary manslaughter instruction was unclear, we will deem the request as having been made because the trial court mentioned an "informal" request by defense counsel and there was discussion by the court regarding the appropriateness of a voluntary manslaughter instruction.

When an instruction has been requested,

"[a] district judge has a duty to instruct the jury on any lesser included offense established by the evidence, regardless if that evidence is weak or inconclusive. There is, however, no duty to instruct on a lesser included offense if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented. [Citations omitted.] When reviewing a district judge's refusal to give a requested instruction, this court must view the evidence in the light most favorable to the requesting party." *Moore*, 287 Kan. at 130.

Applying this standard of review, we must determine whether there was evidence of voluntary manslaughter, which includes the intentional killing of a human being upon a sudden quarrel or in the heat of passion. K.S.A. 21-3403(a). To constitute voluntary

manslaughter, the killing must have resulted from severe provocation. "The test for whether severe provocation exists is objective, and the provocation must be sufficient to cause an ordinary person to lose control of his or her actions or reason." *State v. Bell,* 266 Kan. 896, 918, 975 P.2d 239, *cert. denied* 528 U.S. 905 (1999); see *State v. Drennan,* 278 Kan. 704, 713, 101 P.3d 1218 (2004).

In this case, the trial court's ruling assumed that Davis' sucker punch, which knocked Henson unconscious, was evidence of provocation that was sufficient for a reasonable person to lose control of his or her actions or reason. See *State v. Guebara,* 236 Kan. 791, 797, 696 P.2d 381 (1985) ("An assault or battery resulting in a reasonable belief that the defendant is in imminent danger of losing his life or suffering great bodily harm may be of sufficient provocation to reduce the killing to voluntary manslaughter. 2 Wharton's Criminal Law § 158."); *State v. Yarborough,* 39 Kan. 581, 18 Pac. 474 (1888) (fight which knocked participant "senseless" constituted provocation).

Nevertheless, the trial court determined a voluntary manslaughter instruction was not warranted because 20 to 30 minutes elapsed between the punch and the shooting. This ruling is supported by decisions upholding similar rulings by trial courts and establishing that an act of violence separated from the provocation by sufficient cooling-off time is not the product of heat of passion. "With the passing of time after provocation, passion cools and gives way to reason and mastery over one's passion. An act of violence separated from the provocation by sufficient cooling time is the product of malice and cold calculation rather than heat of passion." *State v. Follin,* 263 Kan. 28, 38, 947 P.2d 8 (1997).

Most recently, in *State v. White,* 279 Kan. 326, 109 P.3d 1199 (2005), this court noted that White, after being overcome with emotion because he lost custody of his grandchild to his son-in-law, whom he considered abusive, drove from his home in Great Bend to Augusta, walked into a Wal-Mart during daytime hours and, in front of several witnesses, shot his son-in-law, walked out of the Wal-Mart, and stood in the parking lot awaiting arrest. We concluded there was not provocation sufficient to instruct on voluntary manslaughter on the basis of heat of passion or a sudden

quarrel. For support of this holding, the court cited *Follin*, 263 Kan. 28, for the proposition that an act of violence separated from the provocation by a sufficient cooling-off time is not the product of heat of passion. *White*, 279 Kan. at 343.

In *Follin*, the defendant, suspecting his wife was being unfaithful, taped a conversation in which his wife told someone "how much she missed him." 263 Kan. at 30. Follin listened to the tape one morning and again when he left work at around 2:30 p.m. After listening to the tape the second time, Follin picked up his daughters at day care, went to the bank, and then went home and called his wife who was at work, telling her what he had heard. After this conversation, Follin took his daughters and drove around for more than 2 hours. Then, at about 6:15 p.m., Follin called his wife once again. After the two talked, Follin drove his daughters from Wichita to El Dorado. During the drive, the girls made a recording in which they sang and talked, evidencing playful interaction between Follin and his daughters. Once they arrived in El Dorado, Follin took his daughters to the lake where they counted stars. Then, according to Follin's statement to police: " 'I just—I just sit there. My body just was—felt like a furnace. It felt like I was on fire, and my head . . . just felt like it was gonna just explode, and everything was just black.' " 263 Kan. at 31. Although he claimed not to remember doing so, Follin stabbed his daughters, causing their death.

The trial court denied Follin's request for a voluntary manslaughter instruction and that ruling was affirmed on appeal, even though the court noted his listening to the tape and his conversations with his wife might be considered provocation. The court determined the passage of time mitigated any argument of provocation:

"Between his listening to the tape and his murdering the girls, however, many hours passed in which Follin methodically adhered to routine and interacted with his girls in a manner that they did not seem to find unusual. Thus, immediacy and spontaneity, which would seem to be essential elements of the form of voluntary manslaughter defined in K.S.A. 21-3403(a), is wholly missing in the present case." 263 Kan. at 37.

The court cited and discussed an earlier case, *Yarborough*, 39 Kan. 581. In that case, like this one, two men were involved in a

fight in which one of them was knocked "senseless." 39 Kan. at 583. Several hours later, after eating supper and borrowing a revolver, Yarborough went to the other man's rooming house and shot him. The *Yarborough* court determined the circumstances did not justify the giving of an instruction on the lesser offense of voluntary manslaughter, stating:

"The law carefully distinguishes between a sudden transport of passion, which springs instantaneously from what it allows as a sufficient provocation, and which prompts to an immediate act of violence, and a purpose of revenge, which usually follows such passion. In the first case, in condescension to the frailty of our nature the law allows the provocation to extenuate a homicide committed at the instant, from murder to manslaughter. In the other, the provocation furnishing an incentive to revenge, so far from extenuating the crime, is a circumstance to be looked to as evidence of malice; and especially would this be so if the prisoner, in consequence of the provocation, had made threats against the life of the deceased." 39 Kan. at 590.

The court in *Yarborough* considered whether a question of fact or an issue of law was raised when a trial court needed to determine if a reasonable time had elapsed for passion to cool and reason to resume its control. The court concluded: "Most courts seem to agree that if it is clear that there was sufficient time between provocation and the killing to enable the court to determine that the passions had cooled, and so instructed the jury, no error would be committed. Of course, the case should be very clear." 39 Kan. at 589. Although the court noted that an hour had been ruled as sufficient time for there to have been a cooling off, it observed a reasonable cooling-off time was not set by rule. 39 Kan. at 589.

Discussing these authorities, Henson argues it is not clear his passion had cooled. Contrary to his argument, however, the evidence established that Henson, while still angry, had control of his actions. His reaction to the punch was not immediate or instantaneous. Rather, he drove to his home, cleaned up, and took his gun from its usual hiding place. While there, he talked to his wife and introduced her to Hall, an action of such civility and politeness as to contradict the assertion that Henson was acting without control. His wife testified that "nothing he said really made me believe that, you know, he was going to do something horrible." He then drove

back to the garage and, wearing a sweatshirt with the hood pulled up, walked by one man who tried to stop him, deliberately entered the garage, and pointed the gun at Davis, asking, "What's up now, Randy?" In other words, like the defendants in *White* and *Yarborough*, Henson took deliberate steps showing a plan to commit the shooting, *i.e.*, Henson obtained a weapon, traveled to seek out the victim, and threatened Davis. Further, like the defendants in *Yarborough* and *Follin*, during the time between the provocation and the murder, Henson engaged in activities that suggest control of his emotions and reason, *i.e.*, he cleaned up, introduced his wife to Hall, and conversed with her in a way that did not alert her to a loss of control.

Although the elapsed time between the provocation and the shooting was shorter than in the other cases, it was a sufficient cooling-off time for a person to regain reason. And, as stated in *Yarborough*, there is no rule as to how much time is sufficient.

The evidence, even when viewed in the light most favorable to Henson, shows clearly that Henson had ample time to exercise control over his passion and, in fact, did gain control of his actions and regained his reasoning. Given the evidence, a jury could not reasonably convict Henson of voluntary manslaughter, and the trial court did not err in refusing to give a lesser included jury instruction on voluntary manslaughter.

### SECOND-DEGREE RECKLESS MURDER OR INVOLUNTARY MANSLAUGHTER

Next, Henson contends the trial court erred by refusing to instruct the jury on second-degree reckless murder and involuntary manslaughter. This contention lacks merit also.

As previously stated, during the jury instruction conference, defense counsel clearly requested an instruction on involuntary manslaughter. Therefore, the standard of review for this issue is the same as applied to the prior issue: a lesser included offense instruction should have been given if there was evidence supporting the lesser offense, even if the evidence is weak, as long as a jury could reasonably convict Henson of the lesser included offense. See *Moore*, 287 Kan. 121, Syl. ¶ 1. Conversely, if the evidence at trial

excludes a theory of guilt on the lesser offense, an instruction need not be given. *State v. Calderon*, 270 Kan. 241, 256, 13 P.3d 871 (2000); *State v. Moncla*, 262 Kan. 58, 73-74, 936 P.2d 727 (1997).

In order to meet this standard when reckless homicide instructions have been requested, there must be some evidence that the death resulted from conduct propelled by recklessness rather than by a more culpable intent, such as premeditation. According to K.S.A. 21-3201(c), "[r]eckless conduct is conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard for that danger." If the killing is committed recklessly under circumstances manifesting extreme indifference to the value of human life, the homicide is second-degree murder. K.S.A. 21-3402(b); see *State v. McClanahan*, 254 Kan. 104, 109, 865 P.2d 1021 (1993). When there is a lesser degree of recklessness, the homicide may be involuntary manslaughter, as defined in K.S.A. 21-3404(a). The difference between involuntary manslaughter and second-degree reckless murder is the degree of recklessness required to prove culpability. See *State v. Hebert*, 277 Kan. 61, 105-06, 82 P.3d 470 (2004); *Calderon*, 270 Kan. at 255-56; *State v. Davidson*, 267 Kan. 667, Syl. ¶ 2, 987 P.2d 335 (1999).

Considering these definitions, the trial judge concluded the evidence excluded a verdict based upon reckless conduct. Specifically, the judge indicated he would not give "an instruction on second-degree murder-reckless because I don't believe the evidence warrants such an instruction." The judge continued:

"And I think the evidence is clear in this case that the person that approached Mr. Davis approached him with a gun, pointed the gun and fired the gun and shot Mr. Davis basically in the back or top of the head and I don't think that . . . falls within the meaning of the term reckless conduct."

The trial court, therefore, refused to give a jury instruction on either form of reckless homicide—second-degree reckless murder or involuntary manslaughter.

Arguing this ruling was erroneous, Henson suggests pointing the loaded gun at Davis' head was reckless conduct that turned into a homicide when Davis swung his arm while rising out of his chair,

causing the gun to accidentally discharge. While one witness testified the contact occurred after the gun was fired, two witnesses testified that Davis may have bumped the gun or Henson's arm at the same time as the gun went off.

The question is whether this defensive action is evidence that Davis' death was the result of a reckless act. In other words, do the circumstances allow a logical inference that the discharge of the gun was the result of a reckless act? Stated another way, could a jury rationally draw an inference of recklessness from the circumstances? In considering this question, cases from this and other jurisdictions have not focused upon the one piece of evidence on which the inference was based but have considered whether the inference is logical under the circumstances. One piece of evidence "cannot be plucked out of the record and examined in a vacuum." *Godsey v. State*, 719 S.W.2d 578, 584 (Tex. Crim. 1986). This does not mean that the court should resolve inconsistencies; rather the court examines whether any evidence supports the inference the defendant wants to argue.

For example, in *State v. Bolton*, 274 Kan. 1, 49 P.3d 468 (2002), this court concluded the failure to give lesser included reckless homicide instructions was not error because the inference suggested by the defendant was not supported by any other evidence. In that case, a convenience store clerk was shot during a robbery that was videotaped by the store's security camera. The defendant pointed to the video depiction of an individual who approached the sales counter, leaped onto the counter, and grabbed money from the cash register. He argued that the combination of leaping onto the counter and grabbing the money from the register, while holding a loaded weapon pointed at the clerk, made it possible that the gun accidentally fired. Nevertheless, the circumstances of the crime did not support the conclusion that the gunshot resulted from this allegedly reckless act. Specifically, eyewitness testimony substantiated that the money had been grabbed and the robber had backed away before the shot was fired. In other words, the inference the defendant tried to draw was not logical given the circumstances.

Similarly, in this case there is no evidence on which to base an inference other than the testimony that Davis raised his arm at the same time as the shot was fired. The coroner's testimony was that the fatal gunshot wound "traveled . . . in a downward direction from the top of the head on the left-hand side, a little bit towards the back and ending up just about the level of the right ear. So it's going downwards . . . ." No witness testified that the gunshot seemed like an accident; rather, at least one witness tried to talk Henson out of the shooting. In addition, there was overwhelming evidence of a premeditated act. And, Henson never alleged there was an accident. Rather, according to Foster, Henson told her he "shot him [Davis] in the head" because he was angry about being punched. This admission, which was never contradicted, excludes the potential of reckless behavior. See *Hebert*, 277 Kan. at 105 (although in statement to officers defendant indicated he did not intend to shoot victim, at trial defendant testified he did intend to shoot; admission "excludes any theory of guilt that the murder was unintentional but reckless").

The inference that Henson attempts to draw from the evidence is not supported by any other evidence or the circumstances of the crime. A jury could not have reasonably convicted Henson of a reckless homicide, and the trial court did not err in refusing to give the lesser included instructions.

## CUMULATIVE ERROR

Finally, Henson contends that even if the errors he alleges on appeal do not individually require this court to reverse his conviction, the cumulation of the alleged errors denied him a fair trial. "Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction." *State v. Ackward*, 281 Kan. 2, 29, 128 P.3d 382 (2006).

This is not such a case, however. Henson has failed to establish that any error or prejudice occurred at the trial level. Under such circumstances, his claim of cumulative error is without merit. Henson received a fundamentally fair trial.

Affirmed.