No. 74,874

STATE OF KANSAS, *Appellee*, v. RICK E. FOLLIN, *Appellant.*
(947 P.2d 8)

Opinion filed October 31, 1997.

*Thomas Jacquinot*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Mike Ward*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Rick Follin fatally stabbed his 3- and 4-year-old daughters. He was convicted by a jury of two counts of first-degree murder, and he was sentenced to two consecutive hard 40 terms of imprisonment. He appeals the convictions and sentences.

At approximately midday on Saturday, February 5, 1994, a passing motorist, Val Taylor, saw Rick Follin slumped over the steering wheel of his pickup, which was parked near El Dorado Lake. In response to Taylor's questions, Follin indicated by nodding his head that he had tried to kill himself. When Taylor opened the driver's door of Follin's truck, he saw a knife on the floor and he glimpsed blond hair on the seat to Follin's right. Taylor asked Follin if he had killed the child, and Follin indicated that he had. Taylor flagged down another vehicle and asked that person to get help. He returned to the truck, opened the passenger side door, removed a coat, and found two children beneath it on the seat. Neither child had a pulse, and Taylor noted that rigor mortis had set in. When Taylor asked Follin why he had killed the children, Follin replied that "it was his family he could do what he wanted to."

The children were Rick and Sherri Follin's 3- and 4-year-old daughters, Hanah and Kylie. Autopsies showed that each girl had three stab wounds from a single-edge knife in the chest and upper abdomen area. There were no cuts in the clothing because each girl's left arm had been removed from the sleeve of her clothing, thus exposing her chest. The fatal wound for each of the girls perforated her heart. In the pathologist's opinion, the wounds were inflicted by a person with "a knowledge of anatomy to know the location of the heart, and for the knife to be placed between the ribs and not go through the bone." There were no wounds on the girls' hands or arms that would indicate they had tried to defend or protect themselves. The pathologist noted that Kylie had some bruises and scrapes that may have been produced at about the same time as the stabbings.

Rick Follin was flown from El Dorado Lake to Wesley Medical Center in Wichita, where he was treated for a self-inflicted wound in the right side of his neck and a laceration to his left wrist. He was discharged to police custody on February 7. His medical records include several accounts of statements made by Follin to hospital personnel: "[Follin] states he is married and has been having recent marital problems. The patient states he did not want to have to leave his kids and thus prompted this incident." "The patient does state that he killed both of his children by stabbing and then tried to commit suicide," and "He states that he had not been planning this for any appreciable length of time but did appear somewhat distraught." Dr. Pankow, who saw Follin on February 6, reported:

"Pt. was not speaking well but is oriented and claims to remember events of stabbing and suicide attempt—but refused to talk about them. Did say his wife threatened to take away his kids because of 'family problems'; 'I wanted them to be with me' 'I couldn't stand to [lose] them' . . . ."

Dr. Pankow also noted that Follin "denies any psychiatric problems in past" and there was "no evidence of psychotic thinking" at the time of the examination.

In September 1993, Follin began to suspect that Sherri was being unfaithful to him, but she denied it. Follin testified that he bought two microcassette recorders at the end of January, one for taping Sherri's telephone conversations and one for the girls to play with.

On Friday, February 4, Follin went to work at 6 a.m. as usual. Sherri's routine was to take the girls to day care between 7:30 and 8 a.m., on her way to work. On February 4, Follin stayed at work until Sherri left the house, then he went home to listen to the tape. Sherri's voice was on the tape telling someone "how much she missed him." Follin testified that he was devastated because "these were the three most important people in my life, and they were—I was losing them, they were going away." He also testified that "everything I ever wanted was being taken away from me."

Follin went back to work. When he left work at 2:30 p.m., he went home and listened to the tape again. At approximately 4 p.m.,

he resumed his Friday routine. He picked up the girls at day care, and they went to the bank where the girls always got a piece of candy; he got cash for the coming weekend. When they got home, Follin called Sherri at work, let her know that he had taped her morning telephone conversation, and told her to come home to talk to him. According to Follin, she said that she would work until 5:30 p.m. and then bring somebody home with her. She would not say who the other person was. Follin took the girls and left the house "cause [he] wasn't going to be there when she brought somebody home." When Sherri went home, she was accompanied by Diana Hutchinson, a friend and co-worker, and police officers because Sherri was afraid. She testified, "I wanted my daughters. I wanted to get [Follin] away from my daughters. I knew if I went alone I couldn't leave with them. And I thought if I had a police officer with me maybe he would allow me to leave with them."

Follin testified that El Dorado Lake became his destination because he had promised the girls earlier in the week that they would go there on Friday, and Kylie had asked on the way home from the bank whether they were still going to go. First they drove around for an hour and a half to 2 hours, got a soft drink and some small, packaged doughnuts, and the girls busied themselves singing into the tape recorder. At approximately 6:15 p.m., after the police left the Follins' house, Follin called Sherri from a gas station/convenience store. When she answered, he said, "Are you going to tell me who this person is yet?" When she said she would not, he told her that they were going to get something to eat and would call her later. He did not intend to take the girls home until Sherri told him whom she had been talking to on the telephone.

Follin and the girls drove to the lake, stopped, and counted stars. He let the girls go to the bathroom, and they got back in the truck. Follin described what happened next: "I just—I just sit there. My body just was—felt like a furnace. It felt like I was on fire, and my head . . . just felt like it was gonna just explode, and everything was just black." Follin testified that the next thing he remembered was comforting the girls as they were crying. At trial, he denied having any recollection of stabbing the girls.

The bloody knife that was found on the floor of Follin's truck was a butcher knife from a set of knives kept in a drawer in the Follins' kitchen. He testified that the butcher knife had been in the truck for 4 to 5 months and that he used it to cut candy bars for the girls by placing the candy on his leg and cutting it lengthwise. Sherri testified that she rode in the truck once or twice a week and that she had never seen the butcher knife in the truck. Nor had she ever seen Follin use anything other than a paring knife to cut up food for the girls.

Dr. William Logan, a psychiatrist who had examined Follin on two occasions, testified that Follin's thinking on the day he killed his daughters was very dejected, depressed, and morbid. If there had been a voice to provide hope and rationality to counterbalance Follin's thinking, Dr. Logan believed that Follin would have been prevented from killing his daughters. In Dr. Logan's opinion, however, without someone else's providing rationality, Follin's "depression was severe enough and his despondence great enough that he was not sane at the time he killed his daughters." Testifying for the State, Dr. Neil Roach, another psychiatrist, gave the opinion that Follin knew what he was doing when he stabbed his daughters and knew that it was wrong and illegal.

With regard to Follin's claiming to have no recollection of stabbing his daughters, Dr. Roach denied that loss of memory of an incident signified insanity. Dr. Logan related a December 1993 incident that Follin had told him about in which Follin strongly suspected his wife of talking on the telephone with another man. Follin's reaction "was so extreme that he felt like there was a hot flash that went through his body, that his body was on fire, that he had all of a sudden, even though it was daylight, he had a period of time when he said he could not see, things went black." Dr. Logan called this phenomenon an anxiety or panic reaction. In the case of such a very strong emotional reaction, he testified, the body may produce a surge of adrenaline, sweat, increased heart rate, and hyperventilation, which can affect vision. Dr. Logan did not indicate that Follin had described experiencing an anxiety reaction while at El Dorado Lake, but Follin testified at trial that he felt

extremely hot, his head felt like it would "explode," and his vision was blackened.

Follin first argues that the district court erred in failing to instruct the jury on the lesser included offense of voluntary manslaughter. Under K.S.A. 21-3107(3), the district court is required to instruct on lesser offenses as the evidence justifies. With respect to the nature of the evidence, this court has stated: "Such an instruction must be given even though the evidence is weak and inconclusive and consists solely of the testimony of the defendant. The duty to so instruct exists only where the defendant might reasonably be convicted of the lesser offense." *State v. Dixon*, 252 Kan. 39, Syl. ¶ 1, 843 P.2d 182 (1992).

At the instruction conference, defense counsel made the following case for instructing the jury on the lesser offense of voluntary manslaughter:

"[A]lthough I did not file a written request for this . . . I still believe that it may be appropriate for the court to give a voluntary manslaughter instruction, and I'm familiar with the case the court cited earlier, *State v. McClanahan*, 254 Kan. 104, which basically describes Kansas law in that for heat of passion, words are simply not enough; that there has to be some sort of accompanying action that would excite a person of normal sensitivities. In this case we have more than words; we have action, as far as the deteriorating marriage of Mr. Follin, the fact that he was told that his wife was coming home, bringing somebody with her, that eventually their marriage was going to be over with, and I think that that would qualify."

The district court disagreed and denied the request.

On appeal, Follin argues that the instruction should have been given because there was evidence that he killed his girls in the heat of passion. It is long-established Kansas law that the form of voluntary manslaughter defined in K.S.A. 21-3403(a) as an intentional killing committed in the heat of passion must result from " 'severe provocation.' " *State v. McClanahan*, 254 Kan. 104, 114, 865 P.2d 1021 (1993) (quoting *State v. Guebara*, 236 Kan. 791, 796, 696 P.2d 381 [1985]). It is equally well established that the standard for measuring the sufficiency of the provocation is objective. *Guebara*, 236 Kan. at 796-99. A subjective test has been proposed to this court and expressly rejected on more than one occasion:

"The test of the sufficiency of the provocation is objective, not subjective. The provocation, whether it be 'sudden quarrel' or some other form of provocation, must be sufficient to cause an ordinary man to lose control of his actions and his reason. *State v. Coop*, 223 Kan. 302; *State v. Ritchey*, 223 Kan. 99. In applying the objective standard for measuring the sufficiency of the provocation, the standard precludes consideration of the innate peculiarities of the individual defendant. The fact that his intelligence is not high and his passion is easily aroused will not be considered in this connection. *State v. Jackson*, 226 Kan. at 307." *Guebara*, 236 Kan. at 796.

In *Guebara*, evidence was presented by the defense to show that the defendant typically responded to stressful circumstances with abrupt violence and that his ability to assess reality accurately may have been hampered by an anti-social personality disorder and the effect of marijuana use. This court upheld the trial court's refusal to instruct on voluntary manslaughter because "the innate peculiarities of the individual defendant" are not to be considered in evaluating the legal sufficiency of the provocation. 236 Kan. at 799.

Follin wants the court to modify the rule applied in *Guebara* "where the defense of diminished capacity is asserted." The principle he would substitute is stated as follows in his brief: "When there is substantial evidence of mental disability, the test for provocation should consider the accused's subjective state of mind." The rationale offered by the defendant seems to be summed up in this statement: "The whole idea of diminished capacity is based on the notion that an individual is not acting intentionally in the normal sense of the word." In the present case, the jury was given the pattern instruction on diminished capacity, based on PIK Crim. 3d 54.12-B: "Diminished mental capacity not amounting to insanity may be considered in determining whether the defendant was capable of forming the necessary premeditation or intent to kill." Follin has not provided the court with any authority for making the generally objective test a subjective one where there is evidence of diminished mental capacity. Nor has he presented any persuasive reason for doing so. Where a jury has been instructed on the offense of voluntary manslaughter on a theory of provocation and a defendant has presented convincing evidence of diminished mental capacity, the jury will find that the defendant did not form the essential intent to kill. Where a defendant has presented uncon-

vincing evidence of diminished mental capacity, he or she will have shown "[m]ere personality characteristics such as poor impulse control, a short temper, frustration, feelings of dependency, 'snapping,' lack of concern for the rights of other people, etc., [which] do not constitute a mental disease or defect bringing the doctrine of diminished capacity into play." *State v. Wilburn*, 249 Kan. 678, 686, 822 P.2d 609 (1991). In the first instance, the jury will find a defendant not guilty of the offense of voluntary manslaughter. In the latter instance, the evidence that was insufficient for invoking the doctrine of diminished capacity will not be, in defendant's words, "substantial evidence of mental disability" for the purpose of changing the provocation standard from objective to subjective. The jury found Follin guilty of two counts of first-degree murder. The jury did not believe that Follin was incapable of forming the intent to kill due to diminished mental capacity.

The State does not discuss whether the standard should be modified but argues that neither the "heat of passion" nor the provocation in this case warranted the district court's instructing on voluntary manslaughter. In *Guebara*, the court defined heat of passion as "any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror . . . of such a degree as would cause an ordinary man to act on impulse without reflection." 236 Kan. at 796. With regard to the heat of passion, Follin's brief asserts that he was in a state of "extreme vehement emotional excitement" when the killings occurred. Follin, however, refers to no evidence that intense emotions caused him to act without reflection. The State disputes the idea that Follin was seething with rage or passion. The State particularly directs the court's attention to the lengthy tape recording made as defendant drove the girls to the place where he killed them.

The recording, defendant explained, was made in his truck as they were driving to the lake. Because he did not want to sing along with the radio, as he and the girls generally did, Follin gave them the recorder to play with. He testified that the girls recorded nursery rhymes, nursery songs, and Christmas songs and then played them back. Review of the recording discloses that conversation also

was captured. Follin's voice is heard on the tape a number of times, and it never sounds as if he is in a state of vehement emotional excitement.

Follin's testimony established that they were in the truck for several hours. He picked the girls up at the day-care center at approximately 4 p.m. Before going home, they went to the bank to get cash, and they went somewhere to get something to drink. Once home, Follin called Sherri and let her know that he had taped her morning telephone conversation. Then they got into the truck and left the house. Instead of going directly to the lake, they drove in the other direction for awhile, stopped for more soft drinks and some doughnuts. After driving around for "[a]bout an hour and a half or two hours or so," Follin placed a call from a convenience store to Sherri at home at approximately 6:30 p.m. The only thing he said to her was, "Are you going to tell me who this person is yet?" When she refused, he told her that he and the girls were going to get something to eat and would call her again "in a little while." Then he drove from Wichita to El Dorado and to the lake. Once there, they got out of the truck to count stars and go to the bathroom. Follin told the girls that they would go eat and call Sherri.

At this point in Follin's account of what he and the girls did after leaving the house late Friday afternoon, there is an abrupt change in his demeanor. Follin testified that when they got back in the truck, "I just—I just sit there. My body just was—felt like a furnace. It felt like I was on fire, and my head . . . just felt like it was gonna just explode, and everything was just black." The only subsequent thing he remembered was comforting Kylie and Hanah when they cried.

There was no change in the surrounding circumstances that corresponded with the change in Follin. There was no provocation more immediate than his brief conversation with Sherri at 6:30 p.m. when she refused to tell him with whom she had the morning telephone conversation, and it had been approximately 10 hours since he first heard the tape-recorded telephone conversation. Since first listening to the taped conversation, he had returned to work to finish his shift, picked the girls up at the day-care center,

gone to the bank, stopped several times for snacks, and talked to Sherri two more times on the telephone.

Thus, Follin's testimony seems to disprove the contention that he impulsively reacted to provocation when he killed the girls. Moreover, it establishes that he reflected at length on "[his] marriage and what was going to happen, who this [other] person was, the kids." If believed, his testimony might have supported a finding that his murderous actions occurred while he suffered some unusual mental state. It also might have supported a finding that his hearing the taped telephone conversation of his wife ultimately produced that mental state. Between his listening to the tape and his murdering the girls, however, many hours passed in which Follin methodically adhered to routine and interacted with his girls in a manner that they did not seem to find unusual. Thus, immediacy and spontaneity, which would seem to be essential elements of the form of voluntary manslaughter defined in K.S.A. 21-3403(a), is wholly missing in the present case.

In addition to the question of the sufficiency of the provocation, there is a question of timing. In *State v. Yarborough*, 39 Kan. 581, 18 Pac. 474 (1888), Yarborough was convicted of the first-degree murder of L.D. Collier, with whom he worked on the railroad. Although friends, the two exchanged angry words when Collier thought Yarborough had neglected his work responsibilities. "Yarborough answered with a vulgar remark, and Collier struck Yarborough three times, the last time knocking him senseless; after being knocked down, Yarborough had a bruise over his left eye and was bleeding at the nose." 39 Kan. at 583. After Yarborough got up and washed his face, he struck Collier, and the two "clinched, but parties interfered and separated them." 39 Kan. at 584. Several hours later, after eating supper and borrowing a revolver, Yarborough went to Collier's rooming house and shot him. In considering whether the jury should have been instructed on the lesser offense of voluntary manslaughter, the court stated:

"The law carefully distinguishes between a sudden transport of passion, which springs instantaneously from what it allows as a sufficient provocation, and which prompts to an immediate act of violence, and a purpose of revenge, which usually follows such passion. In the first case, in condescension to the frailty of our nature

the law allows the provocation to extenuate a homicide committed at the instant, from murder to manslaughter. In the other, the provocation furnishing an incentive to revenge, so far from extenuating the crime, is a circumstance to be looked to as evidence of malice; and especially would this be so if the prisoner, in consequence of the provocation, had made threats against the life of the deceased. (*Felix v. The State*, 18 Ala. 720. See also 2 Bishop on Crim. Law, § 718.)" 39 Kan. at 590.

In other words, malice and heat of passion are incompatible, and it is the absence of malice which distinguishes voluntary manslaughter from murder. With the passing of time after provocation, passion cools and gives way to reason and mastery over one's passion. An act of violence separated from the provocation by sufficient cooling time is the product of malice and cold calculation rather than the heat of passion.

In *Yarborough*, the court considered whether determining if a reasonable time had elapsed for the passions to cool and reason to resume its control was a matter of fact or law. 39 Kan. at 589. Bishop's treatise on criminal law was quoted to the effect that reasonable cooling time was not set by rule, that a reasonable time was to be that of an ordinary man in like circumstances, and that " 'an hour seems to have been deemed sufficient.' " 39 Kan. at 589 (quoting 2 Bishop on Criminal Law § 712). The court concluded that there was no error in the trial court's refusing to instruct the jury on manslaughter:

"Most courts seem to agree that if it is clear that here was sufficient time between provocation and the killing to enable the court to determine that the passions had cooled, and so instructed the jury, no error would be committed. Of course, the caseshould be very clear. It must be borne in mind that the criminal law holds sane men responsible for the ordinary exercise of their reason; and that, although indulging to a certain extent mere infirmities of human nature, nevertheless it requires the exercise of control or mastery over one's passion. Hence it is said that 'the time in which an ordinary man, under or in like circumstances, would have cooled, is a reasonable time.' (*Kilpatrick v. Commonwealth*, 31 Pa. St. 198.)" 39 Kan. at 589-90.

In the present case, as in *Yarborough*, more time intervened between the provocation and the killing than it would have taken an ordinary person to regain reason.

The State also suggests that Follin's murdering his children rather than his wife or her lover removes any possibility that the offenses could be voluntary manslaughter, rather than murder. The point is that the murderous actions were directed against persons innocent of any responsibility for provoking defendant. Not only has this issue been considered in a number of different courts, but also two distinct variants of this situation have been recognized. The first would be where the killing of the innocent person is by mistake; the second, according to commentators, is the more difficult situation "in which A, actually and reasonably provoked by B, in his passion strikes out at and kills C, known by A to be only an innocent bystander." 2 LaFave and Scott, Substantive Criminal Law § 7.10(g), p. 269 (1986). The commentary continues:

"The courts have quite consistently held that the killing of C does not qualify as manslaughter, apparently upon the assumption that a reasonable man would never be so greatly provoked as to strike out in blind anger at an innocent person. The Model Penal Code [§ 210.3], however, does not so limit provocation, on the ground that there may be some such cases in which 'the cause and the intensity of the actor's emotion . . . [are] less indicative of moral depravity than would be a homicidal response to a blow to one's person.' " 2 LaFave and Scott, § 7.10(g), pp. 269-70.

Among the most recent cases reported are two from Nebraska. In *State v. Cave*, 240 Neb. 783, 484 N.W.2d 458 (1992), the defendant shot Rose, the woman with whom he had been quarreling, and her friend, Linda. Rose died of her injuries, but Linda did not. Defendant was convicted of second-degree murder and attempted second-degree murder. The appellate court rejected the arguments that the murders should be reduced to manslaughter. With regard to Rose's murder, the court concluded that her behavior did not constitute severe, sufficient provocation. With regard to defendant's shooting of Linda, the court affirmed the attempted murder conviction on the ground that any provocation which existed resulted from the acts of the victim's friend, not the victim herself. 240 Neb. at 791-92. The court based its decision on the holding in *State v. Bautista*, 193 Neb. 476, 227 N.W.2d 835 (1975), in which defendant fought with a man at a club; returned later with a gun; encountered the assailant's father, who refused to disclose

his son's whereabouts; and killed the father. Bautista was convicted of second-degree murder. The appellate court rejected his argument that the jury should have been instructed on manslaughter:

"There was no error in refusing to instruct the jury further regarding reasonable provocation because there is no evidence in the record that the defendant was reasonably provoked by the victim. On the contrary, what provocation existed resulted from the acts of the victim's son, not the victim himself." 193 Neb. at 480.

The Vermont Supreme Court applied slightly different reasoning to reach the same result as that reached by the Nebraska court. In *State v. Turgeon,* 165 Vt. 28, 676 A.2d 339 (1996), defendent shot a law enforcement officer after a heated argument between defendant and his wife. Here is the court's analysis:

"The alleged provocation here was a heated verbal exchange between defendant and his wife. She had obtained a relief-from-abuse order, and tormented him about the fact that he was legally barred from visiting his son. She also tried to detain him by holding on to his truck door. His response was a fit of anger, but it was not directed at his wife. Instead, after leading police on a chase through Windsor, he shot Trooper Leahy, a third party who was not involoved in the initial altercation. This response cannot, under any view of the facts, be deemed a reasonable reaction to a domestic confrontation." 165 Vt. at 33.

We conclude in the present case, for all the reasons stated, the trial court was under no obligation to instruct the jury on the lesser offense of voluntary manslaughter. In particular, we reject defendant's suggestion that the court change the standard used for determining the sufficiency of provocation under K.S.A. 21-3403(a) to a subjective one.

Follin next contends that the district court abused its discretion in refusing to grant his motion for mistrial due to a witness' referring to "the cocaine bag." The parties agree that declaration of a mistrial is a matter entrusted to the discretion of the trial court. In order to establish on appeal an abuse of discretion, Follin must show that he was substantially prejudiced by the trial court's refusal to grant a mistrial. *State v. Crane,* 260 Kan. 208, 228, 918 P.2d 1256 (1996).

The incident complained of occurred during the testimony of Captain Murphy from the Butler County Sheriff's Department,

who participated in the search of Follin's residence. The prosecutor, Mike Ward, handed a brown paper bag marked State's Exhibit 60 to Murphy for identification. The bag was sealed with evidence tape. Ward asked the witness to open it, and the witness did so. This exchange followed:

"Q. Would you remove the contents of that sack, please.
A. (Witness complies.)
"MR. WARD [very softly]: What's this?
"THE WITNESS [very softly]: I believe the cocaine bag."

With no further mention of "the cocaine bag," the prosecutor had some knives marked as exhibits and questioned Murphy about them. After completing direct examination of Murphy, the prosecutor turned the questioning over to defense counsel, who cross-examined the witness. Redirect and re-cross examination were followed by a 20-minute recess. Detective Russell Clark was recalled for continued cross-examination by defense counsel, the State rested its case, the jury left the courtroom, and then defense counsel requested a mistrial.

Referring to the jury, the trial court said:

"Well, as far as mistrial is concerned, I'm not sure what they heard or if anyone heard it and in what sort of context they took it. I do not think it's grounds for a mistrial at this point. However, I think the court should admonish the jury, either at this time or at the time the instructions are given."

Defense counsel, however, declined to have the jury admonished to disregard Murphy's remark.

On appeal, defendant contends that he was substantially prejudiced because the shadowy reference to cocaine may have impaired his insanity defense by suggesting to the jurors that an alternative explanation for his unnatural behavior was being concealed from them. The State counters that injecting drug use into the picture had potential for weakening its theory that Follin planned to murder his children and then did so in a deliberate and calculated manner. The trial's outcome, however, shows that the potential for creating reasonable doubt as to whether Follin acted with a clear mind was not realized. By the same token, the jurors' conclusion that defendant acted deliberately, intentionally, and with premed-

itation at the very least tends to show that they did not believe that he murdered in a drug-induced frenzy. Moreover, the one fleeting reference to cocaine, which may or may not have been heard by the jurors, was overwhelmingly outweighed by extensive testimony of State and defense expert witnesses pertaining to Follin's mental condition. He has not shown substantial prejudice from Murphy's remark.

Follin next argues that the trial court abused its discretion in admitting photographs of the victims' bodies. At trial, defense counsel objected to the admission of State's Exhibits 33, 34, 37, and 38. Exhibit 33 shows the body of one of the victims prepared for the autopsy, and Exhibit 34 depicts the body of the other victim, also prepared for autopsy. The bloody clothing has been removed, the bodies have been cleaned, and transparent tape prevents the wounds from gaping. The partially clothed, uncleaned bodies of the victims after they were removed from Follin's truck are shown in Exhibits 37 and 38. Another photograph, State's Exhibit 26, which is not at issue, depicts the bodies of the girls on the seat of the truck. The girls' wounds are not visible in Exhibit 26 due to the confined space of the truck cab. Exhibits 37 and 38 are the only photographs of the girls' wounds as they appeared at the murder scene.

As this court has stated many times:

"The admission of photographs in a homicide case is a matter that lies within the discretion of the trial court, and the trial court's ruling will not be disturbed on appeal absent an abuse of that discretion. Photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence. However, demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue. [Citations omitted.]" *State v. Matson*, 260 Kan. 366, 379, 921 P.2d 790 (1996).

In this case, the photographs are gruesome and disturbing because they accurately depict horrific facts. They are not, however, repetitious or lacking in probative value.

Follin contends that there is an additional condition on the admission of homicide photographs. He cites *State v. Reed*, 256 Kan. 547, 556-58, 886 P.2d 854 (1994), for the proposition that admis-

sion of the photographs would be proper only if the cause of death were at issue. *Reed* does not support defendant's argument. *Reed* does not discuss whether the admissibility of photographs depends on there being controversy over the cause of death.

We next consider if the prosecutor's closing argument prevented defendant from receiving a fair trial. Follin denied criminal responsibility due to insanity at the time he murdered his daughters. In his closing argument, defense counsel urged the jury to find defendant not guilty because of insanity. Here are defense counsel's final words to the jury:

"It just doesn't make any sense. It's not something that a rational person would do. It's not something that a sane person would do. And I know it's difficult because it's something that we don't see every day.

"Please, look at this evidence, carefully, carefully consider it, and return a verdict of not guilty by reason of insanity. Rick needs to go back to the Larned State Hospital for care and treatment. Thank you."

Beginning the final portion of his closing argument, the prosecutor noted: "I'll take counsel's last remark as a concession, that there's one thing that you won't do, and that's find him not guilty. He didn't even argue that. What he argued was not guilty by reason of insanity."

The prosecutor then asked the jury to think about the evidence presented by the defense. He characterized the defense's presentation as being "about poor Rick, bad Sherri." He asked the jury to recall what defense counsel said in his opening statement—"that they were gonna prove to you that Rick was the world's greatest dad, Sherri was a bad mom, Sherri was unfaithful, Rick's dad was the worst son-of-a-gun to ever walk the face of the earth, and . . . that [Rick] was insane." The prosecutor asked the jury to recall the testimony of a social worker concerning Rick's growing up with an alcoholic father. Then he asked a series of rhetorical questions for the purpose of emphasizing to the jury that all the evidence about Rick's childhood may have garnered some sympathy for him but did not prove that he was insane when he murdered his daughters. The next stage of the argument is what Follin specifically objects to:

"Keep in mind, too, [defense counsel] made a lot of points yesterday in talking to Dr. Pryor and again this morning with Dr. Roach, kept asking about all of the reports that had been generated at Larned, wasn't there this report done and wasn't there that report done and aren't these people good and qualified. But none of those reports are in evidence. The only part of the Larned file that they chose to put in, through the testimony of [the social worker], was the social history, the stuff about how he had been raised and how his father had treated him. That's the only part of the Larned file that's in evidence, and it's the only part that you can consider. You can't speculate about the other parts of the Larned file. If they had wanted those in, they could have put them in, but they don't."

Defense counsel's objection was overruled. The prosecutor continued in the same vein:

"There was a reference to the psychological testing done at Larned. That's not in evidence. I put into evidence, through a witness, through the witness who did the psychological testing, the psychological testing that doctor—that was done for Dr. Roach. That's how you put that stuff into evidence. You call the witness."

Defense counsel objected that the prosecutor was improperly "commenting on our failure to call witnesses and present evidence that we didn't need to [call or present]." No reason was stated by the trial judge in overruling the objection.

On appeal, Follin argues that by commenting on his failure to call witnesses and present certain evidence, the State commented on his exercise of a constitutional right, thereby violating due process. He complains that the prosecutor was "suggesting that the defense had an affirmative duty to put Mr. Follin's entire medical file into evidence." He mentions the presumption of innocence. The State's position is that the prosecutor properly commented on the way the defense presented its insanity case.

The essence of the complaint seems to be that the prosecutor's argument suggested to the jury that it was Follin's burden to prove that he was insane at the time of the murders and that he had failed to satisfy that burden. Although reliance on a claim of insanity generally is referred to as an insanity defense, "[i]t lacks some of the characteristics of a true affirmative defense as, although notice of intention to rely thereon is required, a person claiming thereunder does not have the burden of proving the insanity." *State v. Pioletti*, 246 Kan. 49, 57, 785 P.2d 963 (1990).

The standard for appellate review of alleged prosecutorial misconduct during closing argument has been explained as follows:

" 'Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the defendant and deny him a fair trial. [Citation omitted.] The prosecutor is entitled to considerable latitude in arguing the case to a jury. There is no prejudicial error where the questionable statements of a prosecuting attorney are provoked and made in response to previous arguments or statements of defense counsel. [Citation omitted.] Since Kansas does not follow the "plain error" rule used in federal courts, reversible error cannot be predicated upon a complaint of misconduct of counsel during closing argument where no contemporaneous objection is lodged. [Citation omitted.] Remarks made by the prosecutor in closing argument are harmless error if the court finds that the error had little likelihood of changing the result of the trial.' *State v. Baker,* 249 Kan. 431, 446, 819 P.2d 1173 (1991)." *State v. Sexton,* 256 Kan. 344, 363, 886 P.2d 811 (1994).

In *State v. Foster,* 259 Kan. 198, 204, 910 P.2d 848 (1996), the court identified three factors which have been considered by the court in determining whether a new trial should be granted for prosecutorial misconduct:

" 'First, is the misconduct so gross and flagrant as to deny the accused a fair trial (*i.e.,* are the objectionable statements likely to affect the jurors to the defendant's prejudice)? Second, do the remarks show ill will on the prosecutor's part? Third, is the evidence against the defendant of such a direct and overwhelming nature that it can be said that the prejudicial remarks of the prosecutor were likely to have little weight in the minds of the jurors?' " (Quoting *State v. Lewis,* 238 Kan. 94, 98, 708 P.2d 196 [1985].)

In *Foster,* the majority found all three of the closing argument instances to be misconduct but concluded that defendant had not been denied a fair trial as a result: "In conclusion, we do not condone the instances of prosecutorial misconduct in this case. However, the defendant was not denied a fair trial. In light of the overwhelming evidence of guilt, including the defendant's confession and the DNA evidence, the misconduct was harmless error." 259 Kan. at 212.

In *State v. Davis,* 255 Kan. 357, 874 P.2d 1156 (1994), the defendant did not testify. Nor did he present any evidence. With regard to the prosecutor's comment, the court stated:

"The prosecutor's comment made direct reference to the fact that the defendant could not 'give [the jury] one bit of evidence' throughout the course of this entire trial. The statement could be perceived as a comment upon the defendant's failure to testify. It also could be perceived as a comment on the defendant's failure to establish what he intimated in his opening statement—that the State's case rested entirely on the testimony of two 'liars.'

"To the extent that the prosecutor's comment was directed at the defendant's failure to testify, it was improper and constituted trial error. However, the statement does not require reversal if it was harmless error. See, *e.g., State v. Hamilton*, 222 Kan. 341, 345, 564 P.2d 536 (1977). In order for a federal constitutional error to be considered harmless, this court must 'be able to declare the error had little, if any, likelihood of having changed the result of the trial and . . . be able to declare such a belief beyond a reasonable doubt.' *Hamilton*, 222 Kan. at 345. Accord *State v. Beebe*, 244 Kan. at 53; *State v. Bell*, 239 Kan. 229, Syl. ¶ 3, 718 P.2d 628 (1986)." 255 Kan. at 361-62.

The court concluded that the comment was harmless. Of persuasive value were the brevity of the remarks in comparison with the "extended record of trial," direct evidence that defendant was the perpetrator, and the jury's being instructed not to consider defendant's failure to testify. 255 Kan. at 363. The pertinent instruction in the present case placed the burden of proof on the State, exempted defendant of any requirement to prove he is not guilty, and reiterated the presumption of innocence until proven guilty. In addition, in this case where defendant testified and called several other witnesses, the prosecutor's remark could not possibly have been construed to be directed to defendant's exercising his personal right to remain silent. Further, the nature of the prosecutor's remarks does not seem particularly gross or flagrant. In fact, the point he was trying to make is not entirely clear. If there was error, it was harmless.

Follin next complains that it was error for the district court to instruct the jury on general criminal intent. Defendant filed proposed jury instructions, which included the pattern instruction on general criminal intent, PIK Crim. 3d 54.01-A. The district court included the instruction on general criminal intent among those given to the jury. Appellate counsel contends that the district court's giving the instruction was clearly erroneous. The rule is well established that "[w]hen a defendant requests that an instruction be given at trial and such instruction is given, he or she cannot on

appeal claim it was error to give the instruction." *State v. Sutton,* 256 Kan. 913, Syl. ¶ 5, 889 P.2d 755 (1995).

Finally, Follin challenges the imposition of the hard 40 sentence. He first argues that there was not sufficient evidence to support imposition of the hard 40 sentence. In this regard, he contends that the evidence did not show that he subjected the victims to extreme mental or physical cruelty before killing them.

The applicable statute is K.S.A. 1993 Supp. 21-4624. Subsection (5) provided that a defendant could be sentenced to imprisonment for life with no eligibility for parole before serving 40 years. A hard 40 sentence was conditioned on the jury's unanimously finding "beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 1993 Supp. 21-4625 and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist." K.S.A. 1993 Supp. 21-4624(5). The aggravating circumstances identified in K.S.A. 1993 Supp. 21-4625 include the following:

"(2) The defendant knowingly or purposely killed or created a great risk of death to more than one person.

. . . .

"(6) The defendant committed the crime in an especially heinous, atrocious or cruel manner."

The jury found that both these aggravating circumstances were present in each of the murders.

Follin does not challenge the jury's finding that he knowingly or purposely killed more than one person. Because the statute expressly authorizes a hard 40 sentence when one aggravating circumstance exists, defendant argues that without the additional factor of the especially heinous, atrocious, or cruel manner, the mitigating circumstances outweighed the aggravating circumstances.

Among mitigating circumstances identified by the legislature are the following:

"(1) The defendant has no significant history of prior criminal activity.

"(2) The crime was committed while the defendant was under the influence of extreme mental or emotional disturbances." K.S.A. 1993 Supp. 21-4626.

Defendant states that there was undisputed evidence of both. Hence, in defendant's view there was evidence to support one aggravating circumstance and two mitigating circumstances. As if the weighing of aggravating circumstances against mitigating circumstances was a simple numerical process, Follin concludes, "Under these circumstances, the 'hard-40' sentence cannot stand." On the contrary, this court has held and the jury was instructed that the decision of whether aggravating circumstances outweigh mitigating circumstances "should not be determined solely by the number of aggravating or any mitigating circumstances that are shown to exist." PIK Crim. 3d 56.01-E (1994 Supp.); accord *State v. Phillips*, 252 Kan. 937, Syl. ¶ 3, 850 P.2d 877 (1993).

The State asserts in response that there was no evidence, one way or the other, about Follin's criminal history. In addition, the State contends that it was defendant's burden to show mitigating circumstances. On the contrary, "[t]he State has the burden of proof to persuade [the jury] beyond a reasonable doubt that there are one or more aggravating circumstances and that they are not outweighed by any mitigating circumstances." PIK Crim. 3d 56.01-D (1994 Supp.). The procedure for a hard 40 sentencing calls for a defendant to contend that certain mitigating circumstances exist, and the jury is instructed accordingly. In the present case, the jury was instructed as follows:

"The defendant contends that mitigating circumstances include, but are not limited to, the following:

"The defendant has no significant history of prior criminal activity."

With no evidence in the record concerning defendant's criminal record, the absence of a significant history of prior criminal activity "could be considered to have been established." *State v. Bailey*, 251 Kan. 156, 177, 834 P.2d 342 (1992).

With respect to the murders being committed under the influence of extreme mental or emotional disturbance, the State concedes that it "may have application herein."

Principles applicable to this court's consideration of aggravating circumstances relevant to a hard 40 sentencing procedure have been stated previously:

"When the sufficiency of the evidence is challenged for establishing the existence of an aggravating circumstance in a hard 40 sentencing proceeding, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance beyond a reasonable doubt."

"A crime is committed in an especially heinous, atrocious, or cruel manner when the perpetrator inflicts serious mental anguish or serious physical abuse before the victim's death."

"All murders are heinous, atrocious, and cruel. The legislature, by using the phrase 'in a particularly heinous, atrocious, or cruel manner,' meant that the heinous, atrocious, or cruel manner must be in a special or unusual degree, to an extent greater than in other cases." *State v. Cook*, 259 Kan. 370, Syl. ¶¶ 7, 8, 9, 913 P.2d 97 (1996).

Follin's argument that there was not adequate evidence to support a finding that the crimes were committed in a particularly heinous, atrocious, or cruel manner is built on a fragment of the prosecutor's closing argument to the jury. Here is the essence of it:

"What really happened out there? We'll never know. ... Who was killed first? I don't know. Were they outside or inside the truck when they were killed? I don't know. He says outside. Did one watch the other one be killed? I don't know. Probably. Did they try to run away, get away from him? I don't know. Maybe. Was it quick? Did it take long for these little girls to die? I hope not, but I don't know."

The point the prosecutor intended to make was that none of the unanswered questions should prevent the jury from determining that defendant knew what he was doing and knew that it was prohibited by law. Defendant reads the prosecutor's argument as an admission that the State failed to prove in what manner he killed his daughters and, therefore, failed to prove that he acted in an especially or unusually heinous, atrocious, or cruel manner. Pursuing the argument, defendant concludes that the aggravating circumstance "was at best a matter for speculation."

In *Cook*, the court vacated the hard 40 sentence, which had been recommended by the jury upon a finding of a single aggravating circumstance—the crime was committed in a particularly heinous, atrocious, or cruel manner. In that case, the victim had been shot once in the chest and once in the back and died as a result of

hemorrhaging from the chest wound. The State contended that the "pain, suffering, fear, and knowledge of impending death experienced by the victim before he bled to death" was a form of torture. 259 Kan. at 403. This court disagreed:

> "All murders are heinous, atrocious, and cruel. The legislature, by using the phrase 'in a particularly heinous, atrocious, or cruel manner,' meant that the heinous, atrocious, or cruel manner must be in a special or unusual degree, to an extent greater than in other cases. Even when this evidence is viewed in the light most favorable to the prosecution, a rational factfinder could not find that the shooting was committed in a special or unusual degree or to an extent greater than in other cases so as to support the existence of the aggravating circumstance that this crime was committed in a particularly heinous, atrocious, or cruel manner beyond a reasonable doubt. Most of the State's arguments regarding 'torture' experienced by the victim in this case are based on conjecture or speculation." 259 Kan. at 403.

The same might be said of the present case. Indeed, the State's brief only reinforces the impression that the manner in which the girls were killed is unknown:

> "Each of the children had contusions on the front of their lower legs. Did they kick the dash of the truck with their legs as the defendant stabbed them? Or did he kill them outside of the truck, perhaps kneeling on top of them to hold them down while he stabbed them? There is indeed evidence from which a fact finder could infer that the girls struggled against the defendant to the extent that they were capable.
> "Did these little girls witness the death of each other? Or did at least one of them watch the other one get stabbed first? He could not have killed both girls at once. One of them must have heard or watched while her father held down and then repeatedly stabbed her sister. Is that mental cruelty?"

In other words, we can only speculate whether the way Follin killed the girls inflicted serious mental anguish on either of them.

The State also suggests that the girls' deaths from stabbing and the number of times each girl was stabbed should be taken into account. In *State v. Alford*, 257 Kan. 830, 838, 896 P.2d 1059 (1995), the court cited Malone, *The Kansas "Hard-Forty" Law*, 32 Washburn L.J. 147, 156 (1993), for the general rule that "deaths caused by stabbing, bludgeoning, strangling, burning, or drowning often result in a finding of this circumstance, while deaths from shooting do not." *Alford*, an exception to that portion of the rule

dealing with deaths from shooting, provides no insight for stabbing deaths. Malone's source for the rule was Annot., *Sufficiency of Evidence, for Purposes of Death Penalty, to Establish Statutory Aggravating Circumstance that Murder was Heinous, Cruel, Depraved, or the Like—Post-Gregg Cases*, 63 A.L.R.4th 478. A general rule regarding stabbing that can be formulated from the annotations is that stab wounds inflicted to maim, torture, or inflict pain, especially when accompanied by psychological abuse, could constitute the aggravating circumstance. Stab wounds inflicted to kill, even if multiple, probably would not constitute evidence sufficient to establish the aggravating circumstance. See Annot., 63 A.L.R.4th 478, § 4[b] and [c]. In the present case, defendant's intent to inflict fatal wounds is called to the court's attention by the State as proof of his extreme cruelty:

"They had each been stabbed 3 times in the center of their chest. There were no knife holes in their clothing. Their clothes were missing buttons and buttons were found loose in the truck. The defendant had apparently ripped their blouses open in order to expose their chests so that he could see the exact spot in which he wanted to drive the knife he used to kill them.

"According to the pathologist, these murder[s] were committed by someone with medical knowledge and by someone intent on doing fatal damage to the heart muscle."

The State's interpretation of this evidence is not convincing. Follin's conduct is more susceptible to being interpreted as the perpetrator's avoiding infliction of serious anguish or physical abuse before the victim's death.

Finally, the State seems to suggest that the tender ages of the victims contribute to the atrocious manner in which the murders were committed. No authority is cited for the proposition. The plain language of the statute does not support the State's suggestion. The focus is on defendant's conduct, on his actions as he killed the victims. It is not on the nature of the victim.

After reviewing the evidence in the light most favorable to the prosecution, we conclude that a rational factfinder could not find beyond a reasonable doubt that Follin killed his daughters in an especially heinous, atrocious, or cruel manner as those statutory terms have been defined. With the elimination of that aggravating

circumstance, our inquiry shifts to the balance of the remaining aggravating circumstances of multiple murders against the mitigating circumstances of no significant history of prior criminal activity and defendant's committing the murders under the influence of extreme mental or emotional disturbance.

The determination whether aggravating circumstances are outweighed by mitigating circumstances is one of fact, which is made by the jury in the hard 40 sentencing proceeding. The combination of aggravating and mitigating circumstances that remain after elimination of the especially heinous, atrocious, or cruel factor was not considered by the jury in the present case, and there is no way of ascertaining what the jury's determination would have been. In *Bailey*, this court considered defendant's contention that the mitigating factors outweighed the aggravating factors:

"We have no hesitancy in concluding that the evidence supports the findings of aggravating circumstances and that any mitigating circumstances were insufficient to outweigh the aggravating circumstances. Indeed, under the facts herein any mitigating factors are not only outweighed by the aggravating factors, the aggravating factors overwhelm them. Further, we have examined the record thoroughly and reviewed the evidence in light of each aggravating factor singly and find that the mitigating circumstances are so weak that we would affirm the sentence even if only one of the aggravating circumstances would have been found constitutionally valid." 251 Kan. at 177-78.

Although the question of whether this court could undertake an independent weighing was merely hypothetical in *Bailey*, the court necessarily implied that it would have done so. As defendant points out, by statute a hard 40 sentence receives automatic review, and "[w]ith regard to the sentence, the [supreme] court shall determine . . . whether the evidence supports the findings that an aggravating circumstance or circumstances existed and that any mitigating circumstances were insufficient to outweigh the aggravating circumstances." K.S.A. 1993 Supp. 21-4627(3)(b). Additional support for this court's making an independent determination exists in the statutory scheme for sentencing. K.S.A. 1993 Supp. 21-4624(5) provides that the jury's verdict is a recommendation of a sentence. K.S.A. 1993 Supp. 21-4624(6) authorizes the trial court to modify the jury's recommendation. Indeed, it mandates modi-

fication "[i]f the [trial] court determines that the imposition of such a sentence is not supported by the evidence." That language differs from the language used for the determination to be made by the jury and by this court. This court is required by statute to consider whether the evidence supports the finding or findings of aggravating circumstances and, if so, then to weigh aggravating circumstances against mitigating ones. That two-step procedure is essentially identical to that followed by the jury. The statute mandates an independent weighing of the aggravating and mitigating factors by this court.

Having eliminated the especially heinous circumstance, the factors to be placed on the scales are two murders on the aggravating circumstances side and lack of a significant criminal record and serious emotional disturbance on the mitigating side. This combination does not produce the overwhelming disparity presented in *Bailey*. However, the jury did not find the evidence of insanity persuasive, nor did it find that Follin's mental capacity was diminished. Likewise, we do not find defendant's psychological evidence to be very persuasive. In the context of this case, we conclude that the two mitigating factors do not outweigh the aggravating factor of the multiple deaths.

We affirm defendant's convictions and sentences.