NOT DESIGNATED FOR PUBLICATION

No. 117,831

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JORGE A. ZAPATA-GRIMALDO,
*Appellant*.

MEMORANDUM OPINION

Appeal from Lyon District Court; W. LEE FOWLER, judge. Opinion filed November 21, 2018. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Amy L. Aranda*, first assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., BUSER and SCHROEDER, JJ.

PER CURIAM: Jorge A. Zapata-Grimaldo appeals his jury trial conviction for attempted voluntary manslaughter. On appeal, he claims multiple errors by the trial court, as follows: the evidence was insufficient to convict him of attempted voluntary manslaughter; the exclusion of evidence was error; the jury instruction on attempted voluntary manslaughter was given in error; it was error not to instruct the jury on reckless aggravated battery; there was prosecutor error; and all of the errors combined created cumulative error. We disagree with Zapata-Grimaldo—the evidence was sufficient and none of the errors were sufficient to require a new trial. Affirmed.

1

The State charged Zapata-Grimaldo with rape, criminal damage to property, criminal restraint, and attempted second-degree murder, with an alternative count of aggravated battery. In its proposed jury instructions, the State added attempted voluntary manslaughter as a lesser included offense for attempted second-degree murder.

Maria Labrada, Zapata-Grimaldo's wife; law enforcement; several witnesses; and Zapata-Grimaldo testified at trial. In 2015 Labrada attended a party at a friend's house for dinner and drinks, and Zapata-Grimaldo agreed to stay home with their children. Throughout the night, Zapata-Grimaldo called and sent text messages to Labrada. Ultimately he went to the party to bring Labrada home.

At first Labrada did not want to leave and she hid behind several of her friends. Zapata-Grimaldo spoke with one of the men there and Labrada agreed to return home with Zapata-Grimaldo. Another friend at the party, Saunders Souvannaraj, followed the couple home. Shortly after that, he and Zapata-Grimaldo spoke by phone. Souvannaraj testified Zapata-Grimaldo was upset about the others at the house party. Souvannaraj tried to comfort Zapata-Grimaldo to make sure he was not mad. Then, two men from the party arrived at Zapata-Grimaldo's house, interrupted the phone call, and confronted Zapata-Grimaldo. Souvannaraj and Zapata-Grimaldo spoke by phone again after the confrontation. Souvannaraj testified Zapata-Grimaldo was still upset and mad. Souvannaraj's text messages and his cell phone call log were reviewed. Law enforcement testified Souvannaraj's last phone call with Zapata-Grimaldo was at 1:20 a.m. Souvannaraj reportedly believed Zapata-Grimaldo was calm because he invited Souvannaraj over for a drink.

Zapata-Grimaldo testified about the confrontation in his home. According to him, one of the two men confessed to flirting with Labrada at the party and tried to kiss her.

While Zapata-Grimaldo was holding his baby, the first man pulled out a pair of brass knuckles and the second repeatedly threatened him. Zapata-Grimaldo testified he was angry because of the confession and threats. Zapata-Grimaldo also testified Percy Billingsly arrived a bit later, told the two men to leave, and they did. Next, Labrada's phone rang, Zapata-Grimaldo answered it, realized it was one of the men calling for Labrada, cursed at the man, and hung up the phone. Zapata-Grimaldo told the jury "[t]hat pissed me off again, made me upset."

Billingsly testified when he and the other two men left, Zapata-Grimaldo was angry. According to Billingsly, Zapata-Grimaldo spoke with him by phone twice after the confrontation. In the first call, Zapata-Grimaldo told Billingsly everything was fine and he did not seem upset. In the next call, Zapata-Grimaldo woke Billingsly up and "seemed upset." Zapata-Grimaldo told Billingsly he needed a ride because his son was sick, so Billingsly met Zapata-Grimaldo and drove him to Topeka. Billingsly admitted he lied to law enforcement and first reported he took Zapata-Grimaldo to Wichita.

According to law enforcement, Billingsly reported he left Zapata-Grimaldo's house at about 2 or 2:15 a.m. after the confrontation. He called Zapata-Grimaldo at 3:18 a.m. and Zapata-Grimaldo told him everything was okay. Law enforcement also testified Billingsly told Zapata-Grimaldo 25 seconds is not worth 25 to life. According to Billingsly, he told this to Zapata-Grimaldo in case the two men returned. Zapata-Grimaldo called Billingsly at 3:53 a.m. and Zapata-Grimaldo's neighbor called 911 at 3:54 a.m.

The charges against Zapata-Grimaldo are based on acts alleged to have occurred between the phone calls with Billingsly. Labrada went to bed before the two men showed up at her home. Sometime after they left, Zapata-Grimaldo accused Labrada of having an extramarital affair. According to Labrada, he woke her up in their bedroom and then confronted her in their living room. Labrada testified Zapata-Grimaldo grew "more and

3

more angry" every time she denied the accusations. Labrada testified Zapata-Grimaldo then searched through her cell phone messages and social media account, asking about every male friend. Labrada believed this lasted for 20 to 25 minutes. According to Labrada, as she began to leave, Zapata-Grimaldo grabbed her by her hair and threw her to the ground. He then punched and slapped her face. Labrada testified he screamed at her, she grew scared, and she urinated. According to Labrada, Zapata-Grimaldo removed her pants and raped her. Afterwards, he continued to yell at her, accused her of cheating, and hit her again. As Labrada was crying, Zapata-Grimaldo leaned down, told her to be quiet, and then began choking her with both hands. He then straddled her, pushed her to the ground, and sat on her. Labrada testified she violently kicked her legs, but he put all of his weight on her neck as he choked her. According to her, Zapata-Grimaldo was red faced, crying, yelling, and "[h]e was so angry." She could not breathe, felt her face throbbing, and lost consciousness. After regaining consciousness, she fled to a neighbor's home and the neighbor called 911.

Zapata-Grimaldo's testimony contradicted Labrada's version of the events. According to him, the couple had sexual intercourse the day before the incident. He testified the night of the incident, Labrada was drunk at her friend's party so he went to bring her home. After the confrontation with the other men, Zapata-Grimaldo claims Labrada left the bedroom to get a glass of water and then laid on the floor. From there, she urinated, he helped her change, and she fell asleep. He then woke her, confronted her about cheating, and showed her messages on her phone from one of the men at the party. According to Zapata-Grimaldo, he was not yelling but asking her questions rapidly. She tried to push him away then he slapped her in the face. Zapata-Grimaldo admitted he then punched Labrada several times. He also admitted to being upset and angry. According to Zapata-Grimaldo he stopped, gave Labrada a change of clothes, and she told him that she would ruin his life. He testified she choked herself. He claims he then went to check on his son and Labrada fled the house.

4

A jury convicted Zapata-Grimaldo of attempted voluntary manslaughter, aggravated battery, criminal damage to property, and criminal restraint. The district court sentenced Zapata-Grimaldo to a term of imprisonment of 136 months.

ANALYSIS

*The evidence was sufficient.*

Zapata-Grimaldo alleges there is insufficient evidence for a jury to convict him of attempted voluntary manslaughter.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

An attempt is "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 2017 Supp. 21-5301(a). Voluntary manslaughter is "knowingly killing a human being committed: (1) Upon a sudden quarrel or in the heat of passion; or (2) upon an unreasonable but honest belief that circumstances existed that justified use of deadly force." K.S.A. 2017 Supp. 21-5404. The core elements are an intentional killing and legally sufficient provocation. *State v. Campbell*, 308 Kan. 763, 775, 423 P.3d 539 (2018).

The district court instructed the jury on a charge of attempted voluntary manslaughter based on the "heat of passion." Although Kansas statutes do not define "heat of passion," the Kansas Supreme Court has defined it as "'"any intense or vehement

5

emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror, based on impulse without reflection."'" *Campbell*, 308 Kan. at 775. "[T]here must be an adequate provocation that deprives a reasonable person of self-control and causes that person to act out of passion rather than reason. Mere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter." *State v. Hayes*, 299 Kan. 861, 866, 327 P.3d 414 (2014). Acts of violence separated from the provocation by sufficient cooling-off time is not the product of heat of passion. *State v. Henson*, 287 Kan. 574, 583, 197 P.3d 456 (2008). Although an hour may be sufficient time for a cooling-off period, a reasonable cooling-off time is not set by rule. 287 Kan. at 585.

In the light most favorable to the State, a rational fact-finder could have found the defendant guilty beyond a reasonable doubt of attempted voluntary manslaughter. The evidence reflects a heated argument between Labrada and Zapata-Grimaldo while he was going through her phone and getting upset. He was becoming more and more upset and when she started to leave the room, he pulled her by her hair to the ground. He then started to hit her in the face and, according to Labrada, he raped her and continued to hit her. Zapata-Grimaldo was on top of her as he hit her, and she was trying to kick him to get him off. Zapata-Grimaldo's face became red, he was crying and yelling; "he was so angry." She could not breathe and passed out. Upon regaining consciousness, she fled to a neighbor's home and the neighbor called 911. Given the totality of these facts, we are convinced a reasonable fact-finder could find Zapata-Grimaldo acted in the "heat of passion," thus the evidence was sufficient to convict him of attempted voluntary manslaughter.

*All relevant evidence is admissible.*

An appellate court assesses a district court's decision to admit or exclude evidence using a three-step analysis. *State v. Coones*, 301 Kan. 64, 77, 339 P.3d 375 (2014). First,

6

it addresses whether the evidence is relevant because all relevant evidence is generally admissible. K.S.A. 60-407(f). Relevant evidence is evidence having "'"any tendency in reason to prove any material fact."'" *State v. Page*, 303 Kan. 548, 550, 363 P.3d 391 (2015). Relevance has two elements: materiality and probative value. Evidence is material when the fact it supports is in dispute and is significant under the substantive law of the case. *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016). The appellate standard of review for materiality is de novo. *Page*, 303 Kan. at 550. "'Evidence is probative if it furnishes, establishes, or contributes toward proof. Probativity is reviewed for abuse of discretion.'" *McCormick*, 305 Kan. at 47. Second, the appellate court determines what rules of evidence or other legal principles apply through de novo review. Finally, the court applies the appropriate evidentiary rule or principle. Review of the district court's application of evidentiary rules depends on the rule applied. *Page*, 303 Kan. at 551.

*Evidence of Labrada's U-Visa was relevant.*

To gain lawful status under a U-Visa, applicants must take several steps. First, the applicant must show he or she suffered substantial physical or mental abuse as a victim of a qualifying crime. 8 C.F.R. § 214.14(b)(1) (2018). Qualifying crimes include, but are not limited to, domestic violence, felony assault, manslaughter, or an attempt of these crimes. 8 C.F.R. § 214.14(a)(9) (2018). Next, he or she must possess credible and reliable information establishing he or she knows the details of the qualifying criminal activity. 8 C.F.R. § 214.14(b)(2) (2018). Additionally, the applicant must show he or she "has been helpful, is being helpful, or is likely to be helpful" to the certifying agency in its investigation or prosecution of the qualifying criminal activity and cannot refuse or fail to provide reasonable requests for information and assistance. 8 C.F.R. § 214.14(b)(3) (2018).

7

Here, evidence of Labrada's incentive to obtain a U-Visa by testifying against Zapata-Grimaldo was both material and probative. Zapata-Grimaldo argued at trial Labrada choked herself. Outside the presence of the jury, Zapata-Grimaldo testified that two weeks before the incident Labrada jokingly suggested he should beat her if they ended their relationship so she could apply for a U-Visa. Labrada admitted she applied for the U-Visa as a result of the incident with Zapata-Grimaldo. She applied to support her children, obtained a work permit, and was awaiting residency. Labrada testified she applied for a U-Visa after speaking to law enforcement. As a U-Visa applicant, Labrada had the burden to show she "has been helpful, is being helpful, or is likely to be helpful" to the certifying agency as it investigates or prosecutes Zapata-Grimaldo for his acts against her. See 8 C.F.R. § 214.14(b)(3) (2018). Moreover, Labrada cannot refuse or fail to provide reasonable requests for information and assistance to the agency certifying her application. See 8 C.F.R. § 214.14(b)(3) (2018). Evidence of her U-Visa application is material because, if a jury believed Zapata-Grimaldo, the evidence provides an alternate and innocent explanation for the strangulation. This evidence is also probative because it contributes toward proof of the conflicting testimony about whether Zapata-Grimaldo choked Labrada or she choked herself.

*The district court erred when it excluded evidence of Labrada's U-Visa application.*

As the next step, the appellate court must determine what rules of evidence or other legal principles apply. This review is de novo. *Page*, 303 Kan. at 551. The appellate court applies the appropriate evidentiary rule or principle.

Kansas law allows any party to "examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility." K.S.A. 60-420. Additionally, this court addressed witness bias and a U-Visa application in *State v. Perez-Aguilera*, No. 110,983, 2015 WL 1513990, at *3-4 (Kan. App. 2015) (unpublished opinion). The State charged Perez-Aguilera with several

8

sex crimes, including aggravated indecent liberties with a child. The mother of the victim filed a U-Visa application based on her earlier incident of domestic violence with Perez-Aguilera. Her application was pending when the State charged Perez-Aguilera for crimes against the minor. The mother's supplemental documents referred to the sexual allegations. Defense counsel alleged the mother had incentive to induce the victim to fabricate allegations against him to obtain a U-Visa. The district court found the line of questioning irrelevant and prejudicial. This court found the district court improperly excluded the evidence of potential bias, although the error was harmless. 2015 WL 1513990, at *3-4. It noted at the admissibility stage, the court must determine whether a jury could find the witness had a motive to testify in a certain manner, but whether the witness had this motive and whether the motive influenced the witness' testimony are questions left to the jury. 2015 WL 1513990, at *3-4.

Here, a jury could find Labrada had a motive to testify in a certain manner. See *Perez-Aguilera*, 2015 WL 1513990, at *3-4. Based on Labrada's testimony, she applied for a U-Visa well after reporting to law enforcement. However, a jury could conclude Labrada believed she needed to testify against Zapata-Grimaldo to be helpful to the certifying agency in its investigation or prosecution against him. See 8 C.F.R. § 214.14(b)(3) (2018). Although the district court found Zapata-Grimaldo's testimony incredible, the credibility about bias is a question left to the jury. 2015 WL 1513990, at *3-4. The district court improperly excluded the proffered evidence.

*The district court committed harmless error.*

The erroneous exclusion of evidence is subject to review for harmless error under K.S.A. 2017 Supp. 60-261. Factors an appellate court can consider in reviewing the erroneous exclusion of evidence for harmless error include "'the importance of the witness' testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points,

9

the extent of cross-examination otherwise permitted, and the overall strength of the case.'" *State v. Burnett*, 300 Kan. 419, 434-35, 329 P.3d 1169 (2014). Where an error implicates a statutory but not federal constitutional right, the party benefiting from the error must persuade the court that there is no reasonable probability that the error affected the trial's outcome, in light of the entire record, for it to be deemed harmless. *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012).

Here, the district court's error to exclude evidence of possible bias was harmless. Domestic violence and felony assault are qualifying crimes to obtain a U-Visa. 8 C.F.R. § 214.14(a)(9) (2018). Labrada had little incentive to testify against Zapata-Grimaldo for a U-Visa because he admitted to repeatedly hitting her. His trial counsel also conceded those facts in opening statements. There is little in the record to conclude a jury would not have convicted of aggravated battery even if Labrada had testified about her U-Visa status. The State has met its burden to show there is no reasonable probability that the error affected the trial's outcome given Zapata-Grimaldo's admissions during trial of hitting her multiple times.

*Jury instruction error was not clearly erroneous.*

> "When analyzing jury instruction issues, we follow a three-step process:
> '(1) determining whether the appellate court can or should review the issue, i.e., whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, i.e., whether the error can be deemed harmless.' [Citation omitted.]" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

Whether a party has preserved a jury instruction issue affects the appellate court's reversibility inquiry at the third step. 307 Kan. at 317. K.S.A. 2017 Supp. 22-3414(3) states, "No party may assign as error the giving or failure to give an instruction . . . unless

10

the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous."

When a party asserts an instruction error for the first time on appeal, the failure to give a legally and factually appropriate instruction is reversible only if the failure was clearly erroneous. *State v. Butler*, 307 Kan. 831, 845, 416 P.3d 116 (2018). The "clearly erroneous" principle is not a standard of review, i.e., a framework for determining whether error occurred. Instead, it supplies a basis for determining if an error requires reversal of a conviction. *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012); *State v. Lewis*, 299 Kan. 828, 856, 326 P.3d 387 (2014).

In evaluating whether an instruction rises to the level of clear error, the issue of "[r]eversibility is subject to unlimited review and is based on the entire record. It is the defendant's burden to establish clear error under K.S.A. 22-3414(3)." *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014). The clear error determination must review the impact of the erroneous instruction in light of the entire record, including the other instructions, counsel's arguments, and whether the evidence is overwhelming. *In re Care & Treatment of Thomas*, 301 Kan. 841, 849, 348 P.3d 576 (2015).

To establish clear error, "'the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict.'" *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016).

Zapata-Grimaldo admits he did not object to the attempted voluntary manslaughter jury instruction at trial. This court may review his argument for the first time on appeal only to determine if the district court committed clear error when it issued the instruction. *Butler*, 307 Kan. at 845.

11

Attempt is an intentional crime. K.S.A. 2017 Supp. 21-5301(a); *State v. Louis*, 305 Kan. 453, 460, 384 P.3d 1 (2016). Intent requires the accused to have a "conscious objective or desire to engage in the conduct or cause the result." K.S.A. 2017 Supp. 21-5202(h). Yet voluntary manslaughter requires a lesser culpable state of mind— knowingly. K.S.A. 2017 Supp. 21-5202(b)(1)-(2); K.S.A. 2017 Supp. 21-5404(a).

Here, the district court erred when it instructed the jury on the appropriate mental state for the attempted voluntary manslaughter because it instructed the jury on a lesser culpable state of mind. Although not required, the Kansas Supreme Court "strongly recommend[s] the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions." *Butler*, 307 Kan. at 847. PIK Crim. 4th 53.010 provides the appropriate jury instruction for attempt. It states:

"53.010 Attempt

"A. (The defendant is charged with an attempt to commit *insert offense*. The defendant pleads not guilty.)

"OR

"B. (If you do not agree that the defendant is guilty of *insert offense*, you should then consider the lesser included offense of *insert offense*.)

"To establish this charge, each of the following claims must be proved:

1. The defendant performed an overt act toward the commission of *insert offense*.

2. *The defendant did so with the intent to commit insert offense*.

3. *The defendant failed to complete commission of insert offense*.

4. This act occurred on or about the ___ day of ___, ___, in ____ County, Kansas.

"An overt act necessarily must extend beyond mere preparations made by the accused and must sufficiently approach consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense. Mere preparation is insufficient to constitute an overt act.

"The elements of the completed crime of *insert crime* are (set forth in Instruction No.__) (as follows: __)." (Emphasis added.) PIK Crim. 4th 53.010.

12

The district court issued the following jury instructions:

"If you cannot agree that the defendant is guilty of the crime of Attempted Murder in the 2nd Degree, you should then consider the lesser included offense of Attempted Voluntary Manslaughter.

"To establish this charge, each of the following claims must be proved:

1. The defendant performed an overt act toward the commission of Voluntary Manslaughter;

2. That the defendant did so in the heat of passion;

3. That this act occurred on or about the 1st day of August, 2015, in Lyon County, Kansas.

. . . .

"An overt act necessarily must extend beyond mere preparations made by the accused and must sufficiently approach consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense. Mere preparation is insufficient to constitute an overt act.

"The elements of the completed crime of Voluntary Manslaughter are as follows:

1. The Defendant *knowingly* killed ML;

2. That the defendant did so in the heat of passion;

3. This act occurred on or about the 1st day of August, 2015, in Lyon County, Kansas." (Emphasis added.)

At the jury instruction conference, the court admittedly modified the culpable state of mind from intentional to knowingly. The State correctly noted the culpable state of mind for an attempted crime is intentional, not knowingly. The court replied:

"I'll express my displeasure with the charges of attempted second-degree murder and attempted voluntary manslaughter. I note that both of those have been recognized crimes by the Kansas Supreme Court; however, when you attempt something like that, you have to make an overt act, which means you're planning an event, so I will always take the position that it probably should be attempted first-degree murder because of the attempt action, but the Kansas Supreme Court has set that case and I'm not going to argue with them."

13

Here, the district court erred twice—it did not instruct the jury it had to find Zapata-Grimaldo failed to kill Labrada and he had the specific intent to commit voluntary manslaughter. The first error was harmless because it would not have changed the verdict. See *Cooper*, 303 Kan. at 771. Zapata-Grimaldo failed to kill Labrada because she testified at trial and the jury easily observed that fact.

The second error, although error, was not clearly erroneous. Although the instruction as given provided the jury with confusion between the two states of mind it was required to look at—knowingly and intentional—the evidence presented to the jury was clear. The State's expert, Dr. Tamara Burke-Moree, testified:

> "[I]t takes a lot of force. I don't know exactly how much force it would take, but, I mean, you have to be very deliberate in your actions. It's not something where you can apply force for a couple of seconds and it would happen, so you have to apply force and continue to apply force for a period of time.
> . . . .
> "[Y]ou don't know at the time that the person has lost consciousness whether they're already deceased at that time or not."

We find the jury was not confused and correctly applied the facts to find Zapata-Grimaldo guilty of attempted voluntary manslaughter, thus the error was not clearly erroneous.

*Was reckless aggravated battery a factually appropriate instruction?*

Zapata-Grimaldo did not request a reckless aggravated battery instruction at trial. He now alleges the district court should have included it as a lesser included crime. K.S.A. 2017 Supp. 22-3414(3) authorizes the appellate court to review the failure to give a jury instruction to determine if the failure was clearly erroneous. To establish clear

14

error, "'the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict.'" *Cooper*, 303 Kan. at 771.

Aggravated battery is "knowingly causing great bodily harm to another person or disfigurement of another person," a severity level 4 person felony. K.S.A. 2017 Supp. 21-5413(b)(1)(A), (g)(2)(A). Even so, the accused commits a severity level 5 person felony if he or she "recklessly caus[es] great bodily harm to another person or disfigurement of another person." K.S.A. 21-5413(b)(2)(A), (g)(2)(C).

Reckless conduct occurs when the accused "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2017 Supp. 21-5202(j). Recklessness is a lower culpable mental state than intentionally and knowingly. K.S.A. 2017 Supp. 21-5202(b)(1)-(3).

The State correctly argues an instruction of reckless aggravated battery is factually inappropriate. We agree. Manual strangulation is strong evidence of an intentional act. *State v. Lloyd*, 299 Kan. 620, 634, 325 P.3d 1122 (2014). Evidence here reveals more than just a reckless act. Zapata-Grimaldo denied choking Labrada. However, Labrada testified that after Zapata-Grimaldo struck her repeatedly and raped her, she began crying. Zapata-Grimaldo struck her again then leaned down, commanded her to be quiet, and started to choke her with both hands. According to Labrada, he then straddled her, pushed her to the ground, and sat on her. She violently kicked him, but he put all of his weight on her neck as he choked her. Labrada testified Zapata-Grimaldo was red-faced, crying, yelling, and "[h]e was so angry." She could not breathe, felt her face throbbing, and lost consciousness. The evidence here does not support finding Zapata-Grimaldo consciously disregarded a substantial and unjustifiable risk because these actions were more like intentional or knowing conduct. See 299 Kan. at 634. The instruction for

15

reckless aggravated battery was not appropriate, and the district court was correct in not giving it.

*There was no prosecutorial error.*

A claim of prosecutorial misconduct—now referred to as prosecutorial error—based on comments made during voir dire, opening statements, or closing argument (that are not evidence) will be reviewed on appeal even when a contemporaneous objection was not made at the trial level. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012); see *State v. McBride*, 307 Kan. 60, 64-65, 405 P.3d 1196 (2017) (statements during closing argument).

Under the modified *Sherman* standard, the appellate court uses a two-step process to evaluate claims of prosecutorial error:

> "These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801, (2011), *cert. denied* 565 U.S. 1221 (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

Courts do not isolate the prosecutor's comments challenged on appeal but review those comments in their context. *Butler*, 307 Kan. at 865. Even if the prosecutor's actions are egregious, reversal of a criminal conviction is not an appropriate sanction if the actions are determined to satisfy the constitutional harmless test. *Sherman*, 305 Kan. at 114.

Zapata-Grimaldo claims the State made two prosecutorial errors in its closing argument. The State argued "[h]e corroborates everything that [Labrada] said happened." According to Zapata-Grimaldo, the State misstated the evidence because he testified he did not rape Labrada or attempt to kill her. However, Zapata-Grimaldo takes the State's comments out of context. The State argued:

> "And we know from his own admissions that he was angry enough that he struck her. He did this to her (indicating). Struck her in the face repeatedly. He says he struck her with his hand and he punched her. He punched her in the face twice. He knows that he knocked her hard enough that she started bleeding and he corroborates her. He corroborates everything that [Labrada] said happened. He became so angry with her, so consumed with anger and jealousy that she says he knocked her to the floor, kicked her, she's bleeding."

In context, it is clear the State argued Zapata-Grimaldo corroborated Labrada's story about the aggravated battery, not rape or attempted murder. We cannot take the State's argument out of context. See *Butler*, 307 Kan. at 865. The evidence supports the State's argument. Labrada testified Zapata-Grimaldo struck her several times, and he corroborated her claim when he testified to punching and slapping her. The State did not commit any prosecutorial error with this argument.

Next, Zapata-Grimaldo claims the State committed prosecutorial error when it stated "[r]ape's not a crime of sexual pleasure. Rape's a crime of control." He likens this comment to those in *State v. Akins*, 298 Kan. 592, 315 P.3d 868 (2014). In *Akins*, the

17

Kansas Supreme Court found the State committed prosecutorial error in its closing statement when it repeatedly claimed, without evidence, Akins groomed his victim for sexual abuse. 298 Kan. at 605. The Supreme Court found the State's repeated use of grooming was "in the same context it would have been used had the State sought to introduce the psychological concept through an expert witness." 298 Kan. at 605.

This case is unlike *Akins*. Here, the prosecutor only once claimed "[r]ape's a crime of control." This isolated statement falls within the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. See *Sherman*, 305 Kan. at 109. Even if the State committed prosecutorial error with its statement about rape, the error is harmless because the comments did not affect the outcome of Zapata-Grimaldo's trial. See *Sherman*, 305 Kan. at 109. The jury found Zapata Grimaldo not guilty of rape.

*There is no cumulative error*

Zapata-Grimaldo claims cumulative error. To determine whether cumulative error exists, the appellate court examines the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. In doing so it determines whether, under the totality of the circumstances, the defendant was substantially prejudiced by cumulative errors and was denied a fair trial. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014); see *State v. Walker*, 304 Kan. 441, 457-58, 372 P.3d 1147 (2016). If any of the errors being aggregated are constitutional in nature, their cumulative effect must be harmless beyond a reasonable doubt. *State v. Santos-Vega*, 299 Kan. 11, 27-28, 321 P.3d 1 (2014). The court will find no cumulative error when the record fails to support the errors defendant raises on appeal. *State v. Marshall,* 303 Kan. 438, 451, 362 P.3d 587 (2015). A single error cannot support reversal under the

18

cumulative error doctrine. *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018); see *Butler*, 307 Kan. at 868 (citing both no error and single error rules).

We find no cumulative error since the record fails to support the errors Zapata-Grimaldo raised on appeal. *State v. Marshall*, 303 Kan. 438, 451, 362 P.3d 587 (2015).

Affirmed.